UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SOVEREIGN BANK,                    )
                                   )
            Plaintiff,             )    CIVIL ACTION NO.
                                   )    11-10601-DPW
v.                                 )
                                   )
MICHAEL P. STURGIS AND             )
CONSTANCE STURGIS                  )
                                   )
            Defendants.            )

MEMORANDUM AND ORDER
March 22, 2012

Plaintiff Sovereign Bank ("Sovereign") brought this action against Defendants Michael and Constance Sturgis to collect a deficiency allegedly due on several notes after Sovereign foreclosed on the properties securing the debts.  The Sturgises responded with an array of fifteen counterclaims alleging various unlawful acts committed by Sovereign in the course of servicing the loans and foreclosing on the mortgages.  Both parties have filed motions to dismiss the respective claims against them pursuant to Fed. R. Civ. P. 12(b)(6).

## I.  STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citation omitted).  All well-pleaded factual allegations in the complaint must be taken as

true and all reasonable inferences must be drawn in the pleader's favor. *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc).

This highly deferential standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." *United States v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir. 1992).  Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley v. Mobil Oil Corp,*, 851 F.2d 513, 515 (1st Cir. 1988)).  The plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007) (internal citation omitted) (elision in original).

## II.  DEFENDANTS' MOTION TO DISMISS

### A.  *Factual Background*

The allegations in the Complaint are read in the light most favorable to Sovereign, the non-moving party as to Defendants' motion.

On December 12, 2006, the Sturgises executed a promissory note in favor of Sovereign in the amount of $1,090,000.00 (the "Flintlock Loan"). Compl. ¶ 10. On March 9, 2009, the Sturgises executed a Home Equity Line of Credit Agreement in favor of Sovereign in the original principal amount of $125,000.00 (the "Flintlock HELOC"). Compl. ¶ 11. The Flintlock Loan and the Flintlock HELOC were secured by mortgages on a property at 24 Flintlock Road, Nantucket, Massachusetts. Compl. ¶ 12. On March 30, 2007, the Sturgises, individually along with a limited liability company known as Scootsam, LLC, executed a promissory note in favor of Sovereign in the amount of $1,775,000.00 (the "Scootsam Loan"). The Scootsam Loan was secured by a mortgage on a property at 5 Amelia Drive, Nantucket, Massachusetts. Compl. ¶¶ 6-7.

The Sturgises defaulted under the terms of the Flintlock Loan, the Flintlock HELOC, and the Scootsam Loan, and Sovereign foreclosed on the two pieces of property securing the loans. Compl. ¶¶ 8, 13. However, the Sturgises remain indebted to Sovereign. On the Scootsam Loan, $747,723.57 remains owing; on the Flintlock Loan, $273,553.07 remains owing; and on the Flintlock HELOC, $128,300.61 remains owing, plus continuing interest, costs, and attorneys' fees. Compl. ¶¶ 9, 14.

**B.   *Analysis***

The Sturgises move to dismiss the Complaint on the grounds that it fails to allege (1) compliance with various foreclosure statutes and (2) personal liability on the part of the Sturgises for the Scootsam Loan.

### 1.   Timing of Motion to Dismiss

Sovereign argues that the Sturgises' motion to dismiss is untimely.  On the one hand, the motion was filed too late to comply with the timing requirements under Fed. R. Civ. P. 12(b).  Such a motion "must be made before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  The Sturgises, however, filed their motion to dismiss over two months after they filed their Answer and Counterclaims.  On the other hand, the motion was filed too early to comply with the timing requirements under Fed. R. Civ. P. 12(c).  Such a motion is appropriate "[a]fter the pleadings are closed."  Fed. R. Civ. P. 12(c).  In the instant case, counterclaims have been filed but Sovereign has not yet responded to them, so the pleadings are not yet closed. *See* 5C Wright & Miller, Federal Practice and Procedure: Civil 3d § 1367 at 213. ("Rule 7(a) provides that the pleadings are closed upon the filing of a complaint and an answer (absent a court-ordered reply), unless a counterclaim, cross-claim, or third-party claim is interposed, in which event the filing of a reply to a

4

counterclaim, cross-claim answer, or third-party answer normally will mark the close of the pleadings.")

The arguments made by the Sturgises all depend on the sufficiency of the Complaint itself and do not relate to pleadings yet to be filed.  I heard oral argument from the parties on the Sturgises' motion at the same time I heard Sovereign's motion to dismiss.  In the interests of efficiency in the administration of justice, I will relieve the Sturgises from their lack of timeliness burden and consider their motion.

> 2.   Compliance with G.L. c. 244, § 14; G.L. c. 244, § 17B; and G.L. c. 183, § 27

The Sturgises move to dismiss on the basis that Sovereign's Complaint failed to allege facts establishing compliance with G.L. c. 244, § 14, the Massachusetts statute governing foreclosure by sale; G.L. c. 244, § 17B, the Massachusetts statute requiring notice to the mortgagor prior to pursuing a deficiency action; or G.L. c. 183, § 27, the Massachusetts statute requiring a post-foreclosure notice of accounting.  The Sturgises claim that compliance with each of the notice requirements is a condition precedent to this suit and that by omitting such allegations, the Complaint fails to state a claim upon which relief can be granted.

> *a. G.L. c. 244, § 14*

G.L. c. 244, § 14, requires that a mortgagee send notice of the foreclosure to the mortgagor at least fourteen days prior to

the date of the sale.  I need not decide whether compliance with
this requirement is a condition precedent which must be alleged
in the Complaint.  Even if such allegations are necessary,
Sovereign's Complaint is sufficient in this regard.  The
Complaint states that "the Bank duly foreclosed" on both
properties.  Compl. ¶¶ 8, 13.  To foreclose "duly" is to do so
"in a proper manner; in accordance with legal requirements."
*Black's Law Dictionary* 576 (9th ed. 2009).  In other words,
Sovereign alleged that it foreclosed in compliance with G.L.
c. 244, § 14, which regulates foreclosures in Massachusetts.

Such a blanket statement of compliance is generally a legal
conclusion outside of a court's consideration for the purposes of
a motion to dismiss.  *Iqbal*, 129 S.Ct. at 1949.  However,
pleading the propriety of the foreclosure is only necessary, if
it is necessary at all, to establish a condition precedent.  The
pleading standard for conditions precedent is governed by Fed. R.
Civ. P. 9(c), which states: "In pleading conditions precedent, it
suffices to allege generally that all conditions precedent have
occurred or been performed."  Sovereign meets this standard when
it alleges generally that the foreclosure was conducted properly.
Accordingly, the purported failure to allege compliance with G.L.
c. 244, § 14, does not support dismissal.

b.    *G.L. c. 244, § 17B*

G.L. c. 244, § 17B, states that "[n]o action for a deficiency shall be brought . . . unless a notice in writing of the mortgagee's intention to foreclose the mortgage has been mailed . . . together with a warning of liability for the deficiency . . . ." G.L. c. 244, § 17B.  The § 17B notice "has been described as a 'condition precedent' to a deficiency action, having the practical effect . . . of treating a foreclosure sale as a complete discharge of the mortgage debt, thwarting a postforeclosure deficiency judgment, absent statutory notice of intent to pursue a deficiency." *Framingham Sav. Bank v. Turk*, 664 N.E.2d 472, 474 (Mass.App.Ct. 1996) (citing *Guempel v. Great American Ins. Co.*, 420 N.E.2d 353, 355-56 (1981)).  The Sturgises argue that because a § 17B notice is a prerequisite to this post-foreclosure collection action, and because Sovereign fails to allege that it sent a § 17B notice regarding either foreclosure sale, Sovereign's Complaint fails to state a claim upon which relief can be granted.

The general language stating that Sovereign "duly foreclosed" is insufficient to establish compliance with the condition precedent at issue here.  A foreclosure can be conducted properly without the mortgagee sending a § 17B notice; it is only if the mortgagee wishes to preserve the right to pursue a deficiency action that such a notice is necessary.

*Framingham Sav. Bank*, 664 N.E.2d at 474 ("[T]he § 17B notice is required only in cases when a foreclosure sale may establish a deficiency--but in that case the notice is a must.")  Sovereign does not allege compliance with § 17B in its Complaint, even in the general manner allowed by Fed. R. Civ. P. 9(c).

Sovereign argues that under Massachusetts law failure to meet a condition precedent is an affirmative defense only and that a plaintiff need not allege compliance in a complaint. This is often the case; for many conditions precedent, there is no obligation to allege compliance.  *See, e.g.*, *Raytheon Co. v. Continental Cas. Co.*, 123 F. Supp. 2d 22, 28 (D. Mass. 2000); *Vasys v. Metropolitan Dist. Com'n*, 438 N.E.2d 836, 840 (Mass. 1982).  Of course, a party might do so in order to trigger a requirement that the defendant deny the condition precedent "specifically and with particularity" or lose the right to raise the issue thereafter.  *Vasys*, 438 N.E.2d at 840.

However, sometimes a condition precedent is considered a "special element," compliance with which must be alleged in the pleading.  *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 779 (Mass. 1975).  For instance, the Massachusetts Supreme Judicial Court has held that the requirement that a consumer plaintiff send a demand letter at least thirty days before commencing a suit pursuant to G.L. c. 93A, § 9, is not only a condition precedent but also an element the plaintiff must allege in its

complaint. *See id*. Similarly, the Massachusetts Appellate Division has held that compliance with the requirement that a plaintiff send notice pursuant to G.L. c. 255B, § 20B, before commencing a suit under that chapter must be included as an element in the plaintiff's complaint. *See U.S. Trust Co. v. Carreiro*, No. 1258, 2000 WL 777959, at *2-3 (Mass. App. Div. June 12, 2000). Neither party provides any case law addressing whether notice pursuant to G.L. c. 244, § 17B in particular must be alleged in a complaint. Acknowledging the lack of guidance on the issue from the state courts, I hold that the notice at issue is sufficiently similar to those above that the Supreme Judicial Court would likely consider it a "special element" that must be alleged in a plaintiff's complaint.

Sovereign has requested leave to file an amended Complaint in the event that I find that it must allege compliance with G.L. c. 244 in greater detail. Leave to amend a pleading pursuant to Fed. R. Civ. P. 15(a) "is to be freely given when justice so requires, unless the amendment would be futile, or reward, *inter alia*, undue or intended delay." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004) (quoting Fed. R. Civ. P. 15(a) and *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 2004)). Given the lack of case law regarding pleading § 17B compliance, and given that Sovereign has alleged compliance with the statute in other filings, justice will be served by allowing

9

amendment.  I will give Sovereign leave to amend its Complaint to allege compliance with G.L. c. 244, § 17B.

> *c.   G.L. c. 183, § 27*

G.L. c. 183, § 27, requires a mortgagee to provide the mortgagor or his successors a written notice containing an itemized accounting of the disposition of the sale proceeds. G.L. c. 183, § 27.  The Sturgises allege that sending such a notice is a condition precedent to a deficiency action and Sovereign must allege compliance with the statute in its Complaint.  The Sturgises cite no case law establishing that G.L. c. 183, § 27, is a condition precedent to a deficiency action.

The First Circuit has held that "[a] federal court sitting in diversity cannot be expected to create new doctrines expanding state law." *Gill v. Gulfstream Park Racing Ass'n, Inc.*, 399 F.3d 391, 402 (1st Cir. 2005).  I am especially reluctant to do so in this case, where the difference between G.L. c. 244, § 17B, which explicitly creates a condition precedent to a deficiency action, and G.L. c. 183, § 27, which mentions no such contingency, is so stark.  Moreover, even if G.L. c. 183, § 27, would otherwise be construed as a condition precedent, I conclude that in the instant case it is preempted by the Home Owners' Loan Act.  *See infra* Part III(B)(9)(d).  Accordingly, the purported failure to allege compliance with G.L. c. 183, § 27, does not provide a ground for dismissal.

3.   <u>Personal Guaranty for the Scootsam loan</u>

The Sturgises additionally claim that Sovereign's Complaint should be dismissed with respect to the Scootsam Loan.  The Sturgises argue:

> Nowhere in Plaintiff's complaint does Plaintiff allege that there are personal guaranty(s) separate and apart from any mortgages or associated note(s) that would allow Plaintiff to sue Defendants personally for any alleged deficiency under the so-called "Scootsam mortgage" which purportedly runs to Scootsam, LLC and not to Defendants individually.

While the Sturgises are correct that Sovereign does not allege a personal guaranty "separate and apart" from the mortgage and the note, the personal guarantee for the debt is alleged to be in the note itself.  Paragraph six of the Complaint states:

> On or about March 30, 2007 the Defendants Michael P. Sturgis and Constance Sturgis, individually along with a now defunct limited liability company known as Scootsam, LLC executed a Mortgage Note in favor of the Plaintiff . . . .

Not only does the Complaint explicitly allege personal liability on the part of the Sturgises, but it also includes and incorporates by reference a copy of the alleged note, which is attached to the Complaint and in which the Sturgises promise to pay the debt to Nantucket Bank.  It is signed by, *inter alia*, "Michael P. Sturgis, individually" and "Constance Sturgis, individually."  The Sturgises' motion to dismiss for failure to allege individual liability on the Scootsam Loan will be denied.

11

### III.  PLAINTIFF'S MOTION TO DISMISS

#### A.  *Factual Background*

The allegations contained in the Counterclaims are read in the light most favorable to the Sturgises, the non-moving party as to Plaintiff's motion.

#### 1.  The Scootsam Loan

On March 30, 2007, the Sturgises obtained the Scootsam Loan from Nantucket Bank, a subsidiary of Sovereign Bank.  The loan was secured by the Sturgises' property (a restaurant) at 5 Amelia Drive, Nantucket, MA.  Counterclaims ¶¶ 27-28.  In late 2009, the Sturgises fell behind on their payments on the loan. Counterclaims ¶ 31.

On October 14, 2010, Sovereign conducted a foreclosure auction at 5 Amelia Drive.  Counterclaims ¶ 40.  Sovereign did not send default or acceleration notices and did not send a notice that it intended to pursue a deficiency regarding the loan.  Counterclaims ¶¶ 38-39.  After the foreclosure sale, Sovereign did not provide an accounting to the Sturgises of the foreclosure sale pursuant to G.L. c. 183, § 27, or an affidavit of compliance with G.L. c. 244, § 17B.  Counterclaims ¶¶ 45-46. The affidavit filed with the Registry of Deeds after the sale pursuant to G.L. c. 244, § 15, was filed late and, the Sturgises allege, is insufficiently specific.  Counterclaims ¶ 42.

On October 15, 2010, Nantucket Bank deducted $4,334.31 from Michael Sturgis's bank account without notice to Mr. Sturgis. Counterclaims ¶ 71.  On October 27, 2010, the Sturgises sent a demand letter pursuant to G.L. c. 93A, alleging that Nantucket Bank had illegally taken the money.  Counterclaims ¶ 78; Counterclaims Exh. G.  Sovereign responded by letter, denying wrongdoing and asserting that the "funds were debited by the Bank in the exercise of its right of set off, and were applied against the Borrowers' indebtedness as co-borrowers (with Scootsam, LLC) of a commercial loan."  Counterclaims ¶¶ 78, 82; Counterclaims Exh. H.  Sovereign made no offer of settlement.  *Id.*

    2.   The Flintlock Loan and HELOC

On December 16, 2006, the Sturgises obtained the Flintlock Loan from Nantucket Bank, a division of Sovereign.  On March 9, 2009, the Sturgises obtained the Flintlock HELOC from Nantucket Bank.  The loan and the HELOC were secured by a mortgage on their primary residence at 24 Flintlock Road, Nantucket, MA. Counterclaims ¶¶ 47-48.  Sometime in 2010, the Sturgises fell behind on their payments on the loan and the HELOC. Counterclaims ¶ 49.

On October 18, 2010, the Sturgises sent a letter to Nantucket Bank requesting information and documents about the Flintlock Loan, payments made, and fees assessed.  The letter asked Sovereign to "treat this letter as a 'qualified written

request'" under the Real Estate Settlement Procedures Act.
Counterclaims ¶ 54; Counterclaims Exh. A.  Sovereign responded,
by letter, that it had "conducted an internal investigation . . .
and . . . verified that all amounts due and owing are valid."
Sovereign enclosed a payment history of the loan but no other
documents, and Sovereign offered to send copies of loan documents
only if the Sturgises would prepay at a rate of five dollars per
page.  Counterclaims ¶¶ 63-66; Counterclaims Exh. C.

On November 9, 2010, the Sturgises, through counsel, sent a
letter to Sovereign stating that the Flintlock loan was rescinded
because Sovereign had not provided the requested documents, the
Sturgises could therefore "only assume that [Sovereign did] not
have them," and a failure to possess such paperwork was grounds
for rescission under the Massachusetts Consumer Credit Cost
Disclosure Act.  Counterclaims ¶ 83; Counterclaims Exh. I.
Sovereign never responded to the rescission letter and took no
steps to terminate its security interest in response to the
letter.  Counterclaims ¶¶ 85, 87, 89.  After sending the
rescission letter, the Sturgises acquired some of the paperwork
regarding the Flintlock loan and identified additional claims
they believe are grounds for recission including that (1) the
Sturgises were only given a single Notice of Right to Cancel;
(2) the HUD settlement statement used was not designed for
refinance loans; and (3) the HUD settlement statement was missing

14

the type of loan, the loan number, and more than thirty five dollars in costs and fees assessed to the Sturgises. Counterclaims ¶ 97.

On March 4, 2011, after rejecting a written short sale offer for the property, Sovereign conducted a foreclosure auction at 24 Flintlock Road. Counterclaims ¶ 90, 100, 111. The sale was conducted in the cold of winter and Sovereign did nothing to advertise it beyond publishing the newspaper notices required by G.L. c. 244, § 14. Compl. ¶¶ 121, 123. Sovereign did not send default or acceleration notices or notices that it intended to pursue a deficiency regarding the loan. Counterclaims ¶¶ 51-53. After the foreclosure sale, Sovereign did not provide an accounting to the Sturgises of the auction pursuant to G.L. c. 183, § 27, or an affidavit of compliance with G.L. c. 244, § 17B. Counterclaims ¶¶ 136-37. The affidavit filed with the Registry of Deeds after the sale pursuant to G.L. c. 244, § 15, was signed by an affiant without personal knowledge of the foreclosure sale. Counterclaims ¶ 134.

After the auction, on March 8, 2011, Sovereign notified the Sturgises' counsel that it had served a 30-day "Notice to Vacate" on the Sturgises. Counterclaims ¶ 138. That same day, Sovereign also instructed the Sturgises' tenants at 24 Flintlock Road to make all rental payments to Nantucket Bank. Counterclaims ¶ 140.

On March 29, 2011, the Sturgises sent a second demand letter to Sovereign and various other parties.  Counterclaims ¶ 142.  Included among the unfair and deceptive acts alleged to have been committed by Sovereign were (1) providing insufficient disclosures at the closing of the Flintlock Loan; (2) removing moneys from Michael Sturgis's account at Nantucket Bank without notice or authorization; (3) responding inadequately to the purported qualified written request; (4) failing to terminate Sovereign's security interest pursuant to the Flintlock Loan after the purported rescission; (5) improperly conducting the foreclosure of the Flintlock Road property; (6) initiating an unlawful eviction against the Sturgises after foreclosure; (7) demanding that the Sturgises' tenants pay rent to Nantucket Bank after foreclosure; and (8) failing to respond with a settlement offer to the Sturgises' previous 93A demand letter.  Counterclaims Exh. J.

In a letter dated April 11, Sovereign responded, denying liability, claiming that the rescission was defective, and failing to make a settlement offer.  Counterclaims ¶¶ 143, 145; Counterclaims Exh. K.  On April 8, 2011, Sovereign had earlier brought suit against the Sturgises in this court.  Counterclaims ¶ 153.

**B.    *Analysis***

1.    Fraud (Count Four)

The Sturgises allege a number of grounds for fraud.  "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b). Under Massachusetts law, to recover for fraudulent misrepresentation the Sturgises must allege that: (1) Sovereign made a false representation with knowledge of its falsity for the purpose of inducing plaintiffs to act thereon; (2) the Sturgises relied upon that representation as true and acted upon it to their detriment; and (3) Sturgises' reliance was reasonable under the circumstances.  *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 105-06 (1st Cir. 2009); *Rodi v. Southern New England Sch. of Law*, 532 F.3d 11, 15 (1st Cir. 2008).  The Sturgises fail to make such allegations.  The Sturgises also fail to provide any material in opposition to Sovereign's motion to dismiss Count Four for failure to plead the elements of fraud with particularity.

The Sturgises allege that Sovereign has committed fraud by "[i]mproperly, invalidly and unlawfully selling, assigning and/or transferring title or attempting to sell, assign and/or transfer the title to Defendants' property as herein described." Counterclaims ¶ 187(a).  They also allege that Sovereign committed fraud by making intentionally false statements, or

17

making statements with reckless disregard for the truth, "where the proper execution of the foreclosure documents with respect to the loans are denied" and "where [Sovereign's] non-compliance with the requirements of M.G.L. c. 244, § 17B[,] affirmatively precluded the deficiency action(s) that [Sovereign] has now brought." Counterclaims ¶ 187(b)(ii-iv). None of these claims identify a false misrepresentation. Executing legal documents, even doing so incorrectly, only constitutes fraud to the extent that a false misrepresentation is included within those documents. The Sturgises do not allege anything about the representations made within the documents. To the extent that the Sturgises are claiming that in the course of the above actions, Sovereign made some sort of misrepresentation, they have not alleged what that misrepresentation was and have therefore failed to "give [Sovereign] fair notice of what the [Sturgises'] claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 42, 47 (1957)).

The Sturgises make a number of additional allegations of fraud, claiming that Sovereign misrepresented that it internally investigated the Flintlock loan[1] and that the foreclosure

---

[1] The Sturgises' allegations in their Counterclaims make it implausible that they acted in reliance on this particular alleged misrepresentation. The statement regarding the internal investigation was contained within a letter dated November 3, 2010. Counterclaims ¶ 60. Just days after receiving the letter,

procedures were properly carried out.  Counterclaims ¶ 187.

However, these claims fail as well because the three types of

detriment allegedly suffered by the Sturgises do not provide the

grounds necessary for a claim of fraud in Massachusetts.

First, the Sturgises allege detriment as "evidenced by their

having significant late fees, interest, attorney's fees and costs

added onto their loan account."  Counterclaims ¶ 191.  However,

this detriment was caused not by the Sturgises' acts in reliance

on the misrepresentation, but instead directly by Sovereign's

alleged unlawful acts.  Second, the Sturgises allege detriment as

"evidenced by their electing not to pursue other foreclosure

alternatives including, but not limited to, refinancing their

loan(s)."  Counterclaims ¶ 192.  However, the Sturgises do not

allege how the election not to refinance was itself a

"detriment"; it is better classified as an "act."  Finally, they

allege detriment as "evidenced by their not pursuing possible

affirmative claims until very late in this matter . . .

--------

the Sturgises' counsel attempted to rescind their loan through a
letter dated November 9, 2010, stating that because Sovereign did
not provide paperwork regarding the loan "there is no evidence
that suggests that the entity that is attempting to foreclose on
my client's loan has legal standing to do so" and that because
Sovereign did not provide the copies of the disclosures
requested, "I [the Sturgises' counsel] can only assume that you
do not have them."  The Sturgises plainly did not rely on or
believe Sovereign's representation that an internal investigation
took place and that all amounts due and owing were valid.
Instead, they questioned Sovereign's right to foreclose and
attempted to rescind the loan.

ultimately forcing [the Sturgises] to expend scarce resources to pursue their claims." Counterclaims ¶ 193.  The Sturgises do not allege, however, that the delay increased the expense of the litigation (which would have created expense regardless) or caused any other type of detriment.  The alleged choice to delay action is also better classified as an "act" than a "detriment."

The Sturgises have failed to plead the elements of fraud with particularity.  Accordingly, I will dismiss Count Four of the Counterclaims.

> ### 2.   <u>Violations of Massachusetts Foreclosure Statutes, G.L. c. 244, §§ 14, 15, and 17B; and G.L. c. 183, § 27 (Counts Six and Seven)</u>

The Sturgises allege that Sovereign violated G.L. c. 244,[2] the chapter of Massachusetts statutes regulating the foreclosure process, and G.L. c. 183, § 27,[3] which requires a post-foreclosure accounting.  Counterclaims ¶¶ 204-09, 211-13.  For each violation, they request damages.  Counterclaims ¶ 210.  However, neither statute provides for damages.

---

[2]   The Sturgises claim damages due to the violation of the foreclosure statutes.  Counterclaims ¶¶ 210, 214.  Sovereign argues that these claims should be dismissed because they are preempted by the Home Owners' Loan Act.  However, I need not reach the somewhat difficult preemption question because the claim should be dismissed for the reasons discussed in this section.

[3]   Moreover, the Sturgises' claims based on violation of G.L. c. 183, § 27, are clearly preempted by the Home Owners' Loan Act.  *See infra* Part III(B)(9)(d).

Massachusetts law provides at least two avenues to pursue damages based on a foreclosure conducted without compliance with the requirements of the foreclosure statutes.  A homeowner can sue in tort when the foreclosure is conducted negligently or in bad faith.  *Levin v. Reliance Co-op. Bank*, 16 N.E.2d 88, 89 (Mass. 1938); *Cambridge Sav. Bank v. Cronin*, 194 N.E. 289, 290 (Mass. 1935).  Similarly, a homeowner can sue for damages pursuant to G.L. c. 93A.  *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000).  The Sturgises are presumably aware of the proper way to bring an action for damages based on wrongful foreclosure; they have included claims for the violation of the above statutes under Count Eleven, Violation of G.L. c. 93A, and Count Twelve, Breach of Implied Covenant of Good Faith and Fair Dealing. Counterclaims ¶¶ 234, 239(f).

The Sturgises' claims for damages based on violations of the foreclosure statutes are properly comprehended within Counts Eleven and Twelve.  Counts Six and Seven are mere surplusage, and more importantly, do not separately provide the basis for the damages that the Sturgises seek.  Therefore, I will dismiss Counts Six and Seven.

### 3.   Unlawful Setoff (Count Eight)

The Sturgises complain that Sovereign unlawfully withdrew funds from Michael Sturgis's account without warning or authorization.  Counterclaims ¶ 216.  Sovereign responds that the

withdrawal was a lawful setoff permitted by both G.L. c. 167D, § 19, and the common law.[4]

Chapter 167D, § 19, governing transfer of depositor funds as a consequence of the depositor's debt to the bank, does not deal with the transaction at issue here.  That statute permits only a "bank" to transfer depositor funds in this manner.  G.L. c. 167D, § 19.  The chapter defines a "bank" as "a savings bank, co-operative bank or trust company incorporated as such in the commonwealth."  G.L. c. 167D, § 1.  Sovereign is not a "bank" under the chapter; instead, it is a "federally-chartered bank," defined as, *inter alia*, "a federal savings and loan association." *Id*.  In some provisions within the chapter, the Massachusetts legislature provided powers to both banks and federally-chartered banks.  *See, e.g.*, G.L. c. 167D, § 5.  In the case of the statute governing the transaction at issue here, the legislature provided this power to "banks" incorporated in Massachusetts alone.

The common law doctrine cited by Sovereign is much less particular in its grant of power.  "It is well settled that funds on general deposit in a bank are the absolute property of the bank, that the relation between the parties is that of debtor and

---

[4] Sovereign also contends that the setoff was expressly authorized by the depository contract governing the account. However, given that the motion is pursuant to Fed. R. Civ. P. 12(b)(6), and given that Sovereign does not provide any evidence of such authorization (such as a copy of the contract), I will leave this argument for another time when the relevant evidence has been presented.

creditor, and that the bank is entitled to apply the balance of the account due the depositor to the satisfaction of the debt due the bank." *Laighton v. Brookline Trust Co.*, 114 N.E. 671, 672 (Mass. 1917) (citing *National Mahaiwie Bank v. Peck*, 127 Mass. 298, 301 (1878)).  However, I am reluctant to construe the common law to provide a power to federally-chartered banks that the legislature so clearly limited to banks incorporated in Massachusetts.  In the absence of case law explicitly applying the common law doctrine to federal banks after the passage (and despite the wording) of the statute, but acknowledging the unexplored questions of federal common law that may lurk in the shadows of this allegation, I will for now deny Sovereign's motion to dismiss as to Count Eight.

   **4.   Violation of the Massachusetts Civil Rights Act (Count Ten)**

   The Sturgises allege that Sovereign's actions, from default to foreclosure (including the unlawful setoff) constitute violations of the Massachusetts Civil Rights Act, G.L. c. 12, § 11I ("MCRA").[5]  To prevail under the MCRA, the Sturgises must prove that "(1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be

---

   [5]  The Sturgises additionally cite G.L. c. 12, § 11H, but that section governs civil actions by the Massachusetts Attorney General, who is not involved in the instant case.

interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation, or coercion.'" *Davis v. Rennie*, 264 F.3d 86, 111 (1st Cir. 2001) (quoting *Swanset Dev. Corp. v. City of Taunton*, 668 N.E.2d 333, 337 (Mass. 1996)).  The Massachusetts Supreme Judicial Court has defined the operative terms in the third prong of the test as follows:

> "Threat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.  "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct . . . . [C]oercion . . . [is] "the application to another of such force, either physical or moral as to constrain him to do against his will something he would not otherwise have done."

*Planned Parenthood League of Massachusetts, Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994) (internal citations omitted).  Sovereign argues that the Sturgises allege no threats, intimidation, or coercion.

Sovereign's argument is well-taken.  The Sturgises argue that Sovereign's conduct is within the ambit of the MCRA because it was motivated by animus.  However, the presence of animus is not the focus of inquiry pursuant to the doctrine established by the Supreme Judicial Court.  Instead the inquiry focuses on the presence of threats, intimidation, or coercion.  Although the Sturgises argue that foreclosure is "economic coercion," they do not allege that Sovereign foreclosed or engaged in any conduct in order to constrain the Sturgises to do something against their wills.  For the same reason, they fail to allege intimidation;

they do not allege that Sovereign acted in order to compel or
deter conduct on the part of the Sturgises.  They do not allege
that Sovereign demanded, explicitly or implicitly, that the
Sturgises do, or refrain from doing, anything.  Nor can any of
Sovereign's alleged actions be characterized as threats.
Although the foreclosure or the setoff might themselves be
unlawful or harmful, it is not alleged that Sovereign undertook
those actions in order to make the Sturgises fearful of *something
else*.

The Sturgises provide a laundry list of Sovereign's alleged
misdeeds as evidence of violation of the MCRA, mentioning almost
every common law and statutory violation alleged in the
Counterclaims.  However, "[a]lthough the act reaches private
actors, it was not intended to create, nor may it be construed to
establish, a vast constitutional tort."  *Buster v. George W.
Moore, Inc.*, 783 N.E.2d 399, 409 (Mass. 2003) (internal citations
omitted).  The Sturgises may well prove some of the conduct that
they have alleged, but they have not alleged that any of that

conduct constituted a threat, intimidation, or coercion.[6]

Accordingly, I will dismiss Count Ten.

> 5.   Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Twelve)

Sovereign argues that because the Sturgises were in default under the loan agreements, the Sturgises cannot claim that Sovereign has breached the implied covenant of good faith and fair dealing.  Sovereign argues that the First Circuit's decision in *F.D.I.C. v. LeBlanc*, 85 F.3d 815 (1996) governs this case. The mortgagor in *LeBlanc* was in default on the note and claimed that the mortgagee owed him an obligation to act in good faith during work-out negotiations.  The court rejected this argument, stating:

---

[6]   Sovereign's other argument is less compelling.  Sovereign claims that, because the events of this case were precipitated by the Sturgises' loan defaults, the MCRA does not apply.  Sovereign quotes the Supreme Judicial Court, stating that "economic loss occasioned by a plaintiff's own conduct, such as when the plaintiff defaults on a note and mortgage, is beyond [the] bounds [of the MCRA]."  *Buster v. George W. Moore, Inc.*, 783 N.E.2d 399, 412 (Mass. 2003).  Sovereign reads *Buster* too broadly.  The case was one in which "[t]he defendants were lawfully entitled to foreclose and it made economic sense to do so."  *Id*. at 411.  The Supreme Judicial Court stated more broadly that "[g]enerally, by itself, a threat to use lawful means to reach an intended result is not actionable under § 11I."  *Id*. (quoting *Sena v. Commonwealth*, 629 N.E.2d 986 (Mass. 1994)).  By comparison, the Sturgises allege that Sovereign was *not* lawfully entitled to foreclose or to engage in much of its conduct.  They allege that Sovereign used unlawful means to collect on the Sturgises' loans.  Economic loss occasioned by a plaintiff's own conduct is beyond the bounds of the MCRA, but the Supreme Judicial Court does not go so far as to say that all economic loss is beyond the MCRA when the defendant's unlawful conduct is a factor.

> At the time the work-out negotiations occurred, however,
> there was no contract between the [mortgagee] and [the
> mortgagor].  [The mortgagor's] November 1992 default ended
> the contractual relationship he theretofore enjoyed with
> [the mortgagee].  We, therefore, hold that [the mortgagor's]
> claim fails to the extent that it relies on the loan
> agreement.

*Leblanc*, 85 F.3d at 822.  Sovereign argues that in the instant

case the Sturgises were in default before the alleged breaches of

good faith and fair dealing took place and that therefore their

claim should fail for the same reason as the *LeBlanc* mortgagor's

claim was dismissed.

Sovereign reads *LeBlanc* too broadly.  The First Circuit

reviewed its rationale in *LeBlanc* five years later.  It stated:

> [In *LeBlanc,* when the mortgagee] sought to collect on the
> guaranty, the defendant asserted that it had breached the
> implied duty of good faith and fair dealing under
> Massachusetts law by refusing to take steps desired by the
> defendant but not required by the loan documents.
> Discerning no evidence that the FDIC had deprived the
> defendant of the benefits of the loan agreement, we upheld
> an order for summary judgment in favor of the FDIC.  We
> emphasized that, in the absence of an agreement to do
> particular acts, Massachusetts law imposed no obligation on
> the FDIC to take the "affirmative steps" that would have
> benefitted the borrower.  While we readily acknowledged that
> the FDIC had taken a "hard-nosed" approach, we pointed out
> that it had "no duty at all" under the loan documents to act
> in the borrower's interest.

*Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 62 (1st Cir.

2001).  In *LeBlanc*, the default was relevant because after the

default, the mortgagee did not owe the mortgagor what the

mortgagor desired under the contract.  In the instant case,

Sovereign continued to be bound after default by at least one

important dimension of the parties' agreement, namely the section of the contract governing the mortgagee's remedies, i.e., foreclosure.  Since these clauses of the contract still govern Sovereign's conduct, it is obligated to carry out the actions permitted by them in good faith.

This reading of *LeBlanc* and of Sovereign's obligations under the contract resonates with longstanding Massachusetts law. "[I]t is a settled principle of law that a mortgagee in executing a power of sale contained in a mortgage is bound to exercise good faith and put forth reasonable diligence." *Levin*, 16 N.E.2d at 89 (internal quotation marks omitted).  While the borrower's default "necessarily alters the contours of the covenant of good faith and fair dealing," *FAMM Steel*, 571 F.3d at 101, it does not vitiate the lender's obligation to execute a foreclosure sale in good faith.[7]  I will therefore deny Sovereign's motion to dismiss Count Twelve.

---

[7]  At oral argument, Sovereign contended that compliance with the "good faith and fair dealing" requirement with respect to foreclosures is not broad-ranging, but instead is more circumscribed and closely related to violations of the foreclosure statutes.  However, the Sturgises' claims include allegations that the foreclosure was not conducted in accordance with G.L. c. 244.  Such violations certainly fall within the ambit of the case law relating to the requirement of good faith and fair dealing.  *See, e.g., Pemstein v. Stimpson*, 630 N.E.2d 608, 611 (Mass. App. C.t. 1994).  To the extent that Sovereign hopes to dismiss particular components of Count Twelve, but not the entire Count, it has not presented arguments related to any particular subpart of the Count.  I will not apply this more fine-grained analysis to the Count until the issues are sufficiently briefed in summary judgment motion practice.

6.   Tortious Interference with Contractual Relations (Count
     Fourteen)

The Sturgises allege that Sovereign tortiously interfered
with their contractual relationship by demanding that their
tenant, who resided at one of the allegedly improperly foreclosed
properties, pay rent to Sovereign instead of the Sturgises.
Counterclaims ¶¶ 247-254.  To establish tortious interference
with contractual relations, the Sturgises must show: (1) the
existence of a contract or business relationship which
contemplated economic benefit; (2) Sovereign's knowledge of the
contract or business relationship; (3) Sovereign's intentional
interference with the contract or business relationship for an
improper purpose or by improper means; and (4) damages.  *Swanset
Dev. Corp. v. City of Taunton*, 668 N.E.2d 333, 338 (Mass. 1996).
Sovereign disputes that it acted "for an improper purpose or by
an improper means."  Sovereign claims that neither its motive nor
its means were improper because its purpose was a "legitimate
advancement of its own economic interest."  *FAMM Steel*, 571 F.3d
at 107 (quoting *Pembroke Country Club, Inc. v. Regency Sav. Bank,
F.S.B.*, 815 N.E.2d 241, 246 (Mass. 2004).

The Sturgises argue that Sovereign's actions, while they
might have been in its economic interest, were *not* legitimate.
The Sturgises contend that Sovereign improperly foreclosed under
the mortgage contract and under G.L. c. 244, § 14.  If a
mortgagee does not strictly follow the terms of a power of sale

29

in the process of foreclosing, the foreclosure sale is wholly void. *U.S. Bank Nat. Ass'n v. Ibanez*, 941 N.E.2d 40, 49-50 (Mass. 2011).  If the sale was void, Sovereign had no right to intervene in the Sturgises' contractual relationship with their tenant by demanding rent from the tenant.  The Sturgises have alleged sufficient facts to support a claim of tortious interference with contractual relations, and Sovereign's motion to dismiss Count Fourteen will be denied.

    7.   Violation of G.L. c. 239 (Count Fifteen)

    The Sturgises allege that after the improper foreclosure, Sovereign served them with a Notice to Quit under the Massachusetts eviction statutes contained in G.L. c. 239.  The Sturgises contend that Sovereign's alleged actions in sending the Notice to Quit constitute a violation of G.L. c. 93A because they were unfair or deceptive.  Sovereign argues that G.L. c. 239 does not provide a right of action for wrongful eviction.

    Sovereign is correct that G.L. c. 239 itself does not provide for damages in the event of a wrongful Notice to Quit. However, the Sturgises have clearly alleged the factual basis for the claim as well as its essence, namely that Sovereign sent a Notice to Quit when it knew that it had no right to evict the Sturgises.  It would not be in the interest of justice to dismiss the claim due to what is essentially mislabeling.  I will give leave to the Sturgises to amend their Counterclaims for the

purpose of relocating their claim under G.L. c. 239 (Count Fifteen) to be alleged within the context of their claims under G.L. c. 93A (Count Eleven).

    8.   HOLA Preemption

Sovereign argues that many of the remaining claims should be dismissed because the state law on which the claims are based is preempted by the Home Owners' Loan Act, 12 U.S.C. §§ 1461 *et seq.* ("HOLA").[8]  "The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that 'the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding.' U.S. Const. art. VI, cl. 2."  *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007) (alteration in original).  Congress's intent to preempt state law pursuant to the Supremacy Clause will be inferred where the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218,

---

    [8]    Sovereign argues that in addition to the Counts addressed below, Count Four (fraud), Count Six (Violation of G.L. c. 244, §§ 14, 15, and 17B), and Count Seven (Violation of G.L. c. 183, § 27) are also preempted by HOLA.  I need not discuss federal preemption of these claims because they will be dismissed for state law related reasons.  *See supra* Part III(B)(1-2).

230 (1947)).  The Supreme Court has "held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713 (1985).

Congress enacted HOLA in 1933 in reaction to the Great Depression.  Its goal was "to provide emergency relief with respect to home mortgage indebtedness" through "a radical and comprehensive response to the inadequacies of the existing state systems." *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159-60 (1982).  In 1989, Congress created the Office of Thrift Supervision ("OTS") and gave its director broad authority under HOLA to regulate and govern "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *Id.* at 145 (quoting *People v. Coast Fed. Sav. & Loan Ass'n*, 98 F. Supp. 311, 316 (S.D. Cal. 1951)).  "This is an extremely broad grant of power that provides ample authority for the [OTS] Director's efforts to enforce consistent, nationwide regulations affecting lending practices, by preempt[ion]." *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 183 (2d Cir. 2005).  "[I]t would have been difficult for Congress to give the [OTS] a broader mandate." *SPGGC*, 488 F.3d at 535 (quoting *de la Cuesta*, 458 U.S. at 161).

OTS regulations are "preemptive of any state law purporting to address the subject of the operations of a Federal savings

32

association." *SPGGC*, 488 F.3d at 535 (quoting 12 C.F.R § 545.2).

The OTS regulations explicitly preempt the field of lending

regulations:

> To enhance safety and soundness and to enable federal
> savings associations to conduct their operations in
> accordance with best practices (by efficiently delivering
> low-cost credit to the public free from undue regulatory
> duplication and burden), OTS hereby occupies the entire
> field of lending regulation for federal savings
> associations.  OTS intends to give federal savings
> associations maximum flexibility to exercise their lending
> powers in accordance with a uniform federal scheme of
> regulation.  Accordingly, federal savings associations may
> extend credit as authorized under federal law, including
> this part, without regard to state laws purporting to
> regulate or otherwise affect their credit activities, except
> to the extent provided in paragraph (c) of this
> section . . . .

12 C.F.R. 560.2(a).  Sovereign points to this regulation when it

alleges that the Sturgises' state law claims are preempted by

HOLA.[9]

The OTS has provided a framework to analyze whether a

specific state law is preempted by HOLA and by 12 C.F.R. 560.2.

"[T]he first step [is] to determine whether the type of law in

question is listed in paragraph (b). If so, the analysis will end

there; the law is preempted."  61 Fed. Reg. 50951-01, 50966.  In

---

[9]  The Dodd-Frank Wall Street Reform and Consumer Protection
Act, Pub. L. 111-203 (2010), significantly diminished the extent
to which HOLA and its implementing regulations may preempt state
law.  *See* Dodd-Frank §§ 1044, 1046 (providing that HOLA
preemption no longer occupies the field of banking regulation,
and limiting preemption to specific conflicts between state and
federal law). Because the Sturgises' loans were consummated
before Dodd-Frank was enacted or effective, the new preemption
standard is inapplicable in the instant case.

paragraph (b), the OTS provides a number of examples of types of state laws that are definitively preempted.  These include laws "purporting to impose requirements regarding," *inter alia*, "[d]isclosure and advertising" and "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." 12 C.F.R. § 560.2(b).

If the state law is none of the types listed in paragraph (b), "the next question is whether the law affects lending."  61 Fed. Reg. 50951-01, 50966.  If it does, a presumption of preemption arises that is reversible "only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption."  *Id*. at 50966-67.  Paragraph (c) states that state laws of particular types, including contract and commercial law, real property law, and tort law "are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." 12 C.F.R. 560.2(c).

  a.  *Massachusetts Consumer Credit Cost Disclosure Act*
      *(Count Thirteen) and Related Declaratory Judgment*
      *Claims (Count One, parts (b)-(g))*

Applying the above analysis to the Sturgises' claims under the Massachusetts Credit Cost Disclosure Act ("MCCCDA") is quite straightforward.  The MCCCDA is a law regulating disclosures

regarding credit.  It is one of the types of law definitively

preempted under paragraph (b).  12 C.F.R. 560.2(b) states:

> The types of state laws preempted . . . include, without
> limitation, state laws purporting to impose requirements
> regarding . . . (9) Disclosure and advertising, including
> laws requiring specific statements, information, or other
> content to be included in credit application forms, credit
> solicitations, billing statements, credit contracts, or
> other credit-related documents and laws requiring creditors
> to supply copies of credit reports to borrowers or
> applicants . . . .

12 C.F.R. 560.2(b).  The various provisions of the Massachusetts

Consumer Credit Cost Disclosure Act, as its name indicates,

govern disclosures and advertising regarding credit.  *See* MCCCDA,

G.L. c. 140D.  The specific violations alleged by the Sturgises

all involve Sovereign's failure to provide proper disclosures

under the law.  Counterclaims ¶¶ 242-245.  The MCCCDA purports to

impose requirements regarding disclosures, and is therefore

preempted by HOLA pursuant to 12 C.F.R. 560.2(b)(9).  Under the

OTS test for preemption, "the analysis will end there; the law is

preempted."  61 Fed. Reg. 50951-01, 50966.

The Sturgises argue that the MCCCDA should not be preempted

because its provisions are "complimentary" to the provisions of

the federal Truth in Lending Act ("TILA"), 15 U.S.C. 1601, *et*

*seq.*  They argue that because Massachusetts has "opted out" of

TILA (so that the federal provisions have no force and the

similar state requirements govern instead), the state

requirements that replace TILA's provisions should not be

preempted.   If it were true that the Federal Reserve had exempted the transaction at issue from TILA so that the MCCCDA might govern, this argument might have some force.   It would seem inequitable, and contrary to Congress's intent, if disclosure requirements would govern credit transactions involving federally chartered savings banks in most states, but where the federal government had explicitly chosen to depend on state regulation instead of TILA, HOLA would preempt that regulation and no disclosure requirements would be imposed at all.   However, that is not the case here.

TILA permits a state that has adequately regulated the area of credit disclosures with provisions that are "substantially similar" to the federal law to apply for an exemption from the TILA requirements from the Federal Reserve.   15 U.S.C. § 1633; 12 C.F.R. § 226.29.   In 1982, Massachusetts was granted such an exemption.   *See* 48 Fed. Reg. 14882-01, 14890.   However, the exemption does not apply to the transaction between Sovereign and the Sturgises.   The Federal Register states:

> Credit transactions subject to the Massachusetts Truth in Lending Act are exempt from chapters 2 and 4 of the Federal act. (The exemption does not apply to transactions in which a federally chartered institution is a creditor.)

*Id*. (emphasis added).   Sovereign is a federally chartered institution.   The transaction in the instant case is therefore subject to TILA.   Any additional protections offered by the

MCCCDA are, under the OTS's analytical framework, preempted by HOLA.[10]

Moreover, the Sturgises may not restate their MCCCDA claims to allege TILA violations.  Under TILA, the borrower's right to rescission expires three years after the consummation of the transaction.[11]  15 U.S.C. § 1635(f).  Courts in this district have split regarding whether the borrower's right to sue for damages under TILA expires one year or three years after the date the disclosure violation occurred.  *See Rodrigues v. Members Mortgage Co., Inc.*, 323 F. Supp. 2d 202, 210 (D. Mass. 2004) (holding that the statute of limitations is one year); *McIntosh*

---

[10]  Sovereign cites two Connecticut cases, *Robinson v. Olin Federal Credit Union*, 48 B.R. 732, 738-39 (D. Conn. 1984), and *Hartford Fed. Sav. & Loan v. Green*, 412 A.2d 709, 713 (Conn. 1979), stating that a federally chartered bank is "subject to the federal and not the Connecticut Truth-in-Lending Act."  *Id*. Sovereign suggests that because Massachusetts, like Connecticut, is subject to a Federal Reserve exemption, therefore the MCCCDA, like the Connecticut TILA, does not apply where the federal TILA does apply.  However, the Connecticut decisions do not adequately discuss the reasons for their conclusion, so I cannot find them persuasive in the context of Massachusetts.  Moreover, the language of the MCCCDA does not purport to limit the types of banks that it regulates.  I therefore must utilize the preemption analysis above, as nothing in the statute indicates that the MCCCDA was not intended to govern the instant transaction.

[11]  At oral argument, the Sturgises maintained that there is no limitation to the time allowed for rescission under TILA under 15 U.S.C. § 1635(i).  Subsection (i), however, explicitly states that the right of rescission in foreclosure is "subject to the time period provided in subsection (f) of this section," and subsection (f) states that "[a]n obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first . . . ."

*v. Irwin Union Bank and Trust, Co.*, 215 F.R.D. 26, 30 (D. Mass. 2003) (holding that the statute of limitations is three years). I need not decide the issue, because the Sturgises missed both deadlines.  The Sturgises filed these counterclaims for damages long after three years had passed since their loan was finalized in 2006.  They sent the letter purportedly rescinding the loan almost four years after the consummation of the transaction.  The letter is self-identified as a qualified written request, seeking information about the loans in order to identify failures to disclose, and was sent well past the three year deadline. Because of the statute of limitations, the Sturgises cannot rescind or sue for damages pursuant to TILA, and because of HOLA preemption, they cannot rescind or sue for damages pursuant to the MCCCDA.  Accordingly, I dismiss will Count Thirteen and Count One, parts (b)-(g).

   b.   *Breach of Contract (Count Two)*

   The mortgage contracts between the Sturgises and Sovereign specifically incorporate several Massachusetts laws regarding foreclosure.  *See infra* Part III(B)(10)(b).  The Sturgises allege that by foreclosing on their properties without complying with these requirements, Sovereign has breached its contract with them.  Counterclaims ¶¶ 164-171.  Sovereign argues that HOLA preempts the Sturgises' claim for breach of contract.

As a general proposition, contract law does not necessarily purport to impose requirements regarding federally chartered banks in particular or lending in general under 12 C.F.R. 560.2(b).  Instead, such a claim seeks to hold the lender to its word.  *See Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 358 (D. Mass 2011) ("Enforcement of [the lender's] promise merely requires the lender to deal fairly and honestly, which no more burdens those lending operations listed in paragraph (b) than it does everyday business transactions.")

However, because contract law here is being used to impose requirements on how Sovereign may collect on its loans, it does "affect lending"; therefore, a presumption of preemption arises. 61 Fed. Reg. 50951-01, 50966.  That presumption is rebutted, though, because "[c]ontract and commercial law" is not preempted where, as here, it "only incidentally affect[s] the lending operations of Federal savings associations . . . ."  12 C.F.R. § 560.2(c).  The contract law at issue in the instant case has no more than an incidental effect on lending because it is a "state common-law doctrine of general applicability" and "is not designed to regulate lending and does not have a disproportionate or otherwise substantial affect on lending."  *Dixon*, 798 F. Supp. 2d at 358 (internal citation omitted).  "It cannot be fairly said that the common law claim for breach of contract, which merely seeks to make defendants live up to the word of their agreements

they sign with their customers, 'more than incidentally affects' lending operations." *McAnaney v. Astoria Financial Corp.*, 665 F. Supp. 2d 132, 164 (E.D.N.Y. 2009).

Sovereign cites no case law supporting its contention that HOLA preempts the Sturgises' breach of contract claim.  This is not surprising; courts have regularly held that when a federally chartered bank violates a specific clause of a mortgage contract, HOLA will not preempt the resulting breach of contract claim. *See, e.g.*, *McAnaney*, 665 F. Supp. 2d at 164 ("The breach of contract claim . . . does not seek to impose specific substantive requirements upon the operations of defendants, apart from compliance with specific contractual obligations . . . . The claim is therefore not preempted . . . ."); *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1086 (C.D. Cal. 2009) (noting a breach of contract claim would "have at most an incidental effect on the exercise of [the lender's] lending powers.  Such a claim does not seek to force [the lender] to set its contracts in a certain way, but rather merely to *adhere* to the contracts it does create."); *Reyes v. Downey Savings and Loan Ass'n, F.A.*, 541 F. Supp. 2d 1108, 1114 (C.D.Cal. 2008) ("[A] law against breach of contract will not be preempted just because the contract relates to loan activity.").  I will do the same.  Sovereign's motion to dismiss Count Two due to HOLA preemption will be denied.

>    *c.    Slander of Title (Count Three); Intentional and/or
>           Reckless Infliction of Emotional Distress (Count Nine);
>           Breach of Implied Covenant of Good Faith and Fair
>           Dealing (Count Twelve); Tortious Interference with
>           Contractual Relations (Count Fourteen)*

Sovereign also argues that the Sturgises' claims based on

(1) slander of title, (2) intentional and/or reckless infliction

of emotional distress, (3) breach of implied covenant of good

faith and fair dealing, and (4) tortious interference with

contractual relations are all preempted by HOLA.  However, the

case law that Sovereign cites only asserts that such tort claims

are preempted to the extent that they are based on a bank's

alleged violation of state laws that are themselves preempted or

to the extent that such claims attempt to directly enforce

substantive lending regulations that would be preempted if the

state were to recreate such regulations as statutes.  *See, e.g.*,

*Bopp v. Wells Fargo Bank, N.A.*, 740 F. Supp. 2d 12, 17 (D.D.C.

2010) (claim for breach of implied covenant of good faith and

fair dealing preempted because plaintiff "is challenging the

terms of his credit, the manner in which his loan was amortized,

the quality and quantity of information disclosed to him, and the

manner in which his mortgage application loan and origination was

processed."); *Ayala World Sav. Bank, FSB*, 616 F. Supp. 2d 1007,

1018 (C.D. Cal. 2009) (emotional distress claim preempted because

 it "challenges the terms of the credit extended"); *Stefan v.*

*Wachovia*, No. C. 09-2252 SBA, 2009 WL 4730904 at *3 (N.D. Cal.

41

Dec. 7, 2009) (claim for interference with prospective economic advantage preempted to the extent that it directly regulates lending activities); *Fultz v. World Sav. and Loan Ass'n*, 571 F. Supp. 2d 1195, 1198 (W.D. Wash. 2008) (emotional distress claim preempted because it is "based on [mortgagee]'s alleged failure to provide timely and meaningful disclosure of the costs and terms of [mortgagors'] loans."); *Haehl v. Washington Mut. Bank, F.A.*, 277 F. Supp. 2d 933, 942-43 (S.D. Ind. 2003) (claim for breach of the duty of good faith and fair dealing preempted where made based on preempted state law against reconveyance fees).[12]

In the instant case, the torts in question are based at least in part on violations of law that are not otherwise preempted by HOLA.   The Sturgises make breach of contract claims that are not preempted by HOLA.   *See supra* Part III(B)(8)(b). The Sturgises also make a claim for wrongful setoff that

_____

[12]  Sovereign also cites *Taguinod v. World Sav. Bank, FSB*, 755 F. Supp. 2d 1064, 1072 (C.D. Cal. 2010), holding that HOLA "preempts any state law relating to good faith and fair dealing" despite the existence of a non-preempted breach of contract claim.   However, *Taguinod* provides no reasoning in support of this conclusion.   The opinion relies on *Haehl*, 277 F. Supp. 2d at 942-43; and *Washington Mut. Bank v. Superior Court*, 115 Cal. Rptr. 2d 765, 775-75 (Cal. App. 2002), neither of which comes to such a sweeping conclusion.   In *Haehl* and *Washington Mutual*, the plaintiffs made no breach of contract claims, but instead brought claims for breach of the duty of good faith and fair dealing in an attempt to directly enforce substantive law requirements regarding lending.   In the instant case the claim for breach of the implied covenant of good faith and fair dealing is based on contract claims that are not themselves preempted; *Haehl* and *Washington Mutual* are therefore inapposite.

Sovereign does not argue is preempted by HOLA.  To the extent that the torts depend on Sovereign's acts in violation of its mortgage contracts with the Sturgises or in unlawfully withdrawing money from Mr. Sturgis's account, they are not preempted.  To the extent, however, that the challenged tort claims depend on preempted substantive lending obligations imposed by the MCCCDA, including those based on the purported MCCCDA rescission, they are preempted.

This dividing line reflects the OTS guidance on preemption. When the torts in question are based on the alleged breach of contract and unlawful withdrawal of money, they do not purport to impose substantive obligations on Sovereign's lending pursuant to 12 C.F.R. § 560.2(b).  The torts "affect lending," however, the presumption of preemption is rebutted pursuant to 12 C.F.R. § 560.2(c) because they are "tort law" and do not affect lending practices more than incidentally.  They would similarly affect any business that bound itself via contract or that wrongfully appropriated an individual's money.  *See Ahmed v. Wells Fargo Bank & Co.*, No. C 11-0436, 2011 WL 1751415 at *4 (N.D. Cal. May 9, 2011) (intentional infliction of emotional distress claim is not preempted by HOLA when it is based on misrepresentation claim that was also not preempted); *Bishop v. Ocwen Loan Servicing, LLC*, Civil Action No. 3:10-0468, 2010 WL 4115463 at *5 (S.D. W. Va. Oct. 19, 2010) ("[R]equiring a bank to perform the

43

obligations of its contract in good faith implicates none of the concerns embodied in HOLA."); *Ayala*, 616 F. Supp. 2d at 1014 ("Slander of title is undoubtedly a tort law and, therefore, even assuming that this slander of title claim incidentally affects the lending operations of Wachovia, any presumption of preemption is adequately rebutted . . . .").

As the OTS has said, "the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." 61 Fed. Reg. at 50966. While allowing the Sturgises to impose their preempted MCCCDA claims via tort law would open the door to such state regulation, allowing them to pursue tort claims based on the consequences of non-preempted law that only incidentally affects lending avoids undermining the infrastructure of basic state law completely.

In arguing that Counts Three, Nine, Twelve and Fourteen should be dismissed as a whole, Sovereign overreaches. Federal law does not require that the whole of each of these Counts be dismissed. Neither party has briefed whether any individual element within the above Counts is preempted by HOLA; therefore, I will not address that question. I will deny Sovereign's motion to dismiss Counts Three, Nine, Twelve and Fourteen subject to reconsideration in the context of summary judgment practice.

      *d.*     *Violation of G.L. c. 93A (Count Eleven)*

The Sturgises allege numerous violations of G.L. c. 93A, the Massachusetts Consumer Protection Act.  Sovereign argues that all claims pursuant to G.L. c. 93A are preempted, citing numerous cases in which HOLA preempts requirements under various state consumer protection laws.  However, here again Sovereign argues too broadly.  OTS has provided two opinion letters regarding preemption of state consumer protection laws that call for a more fine-grained analysis.

In 1996, OTS issued an opinion letter regarding Indiana's Deceptive Acts and Practices Law, which prohibits deceptive acts and practices in the course of commerce.  *See* Opinion of OTS Chief Counsel, P-96-14, Dec. 24, 1996, *available at* 1996 WL 767462 (hereinafter "1996 Opinion Letter").  OTS stated that "[s]tate laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b)."  However, because the law does affect lending, the preemption analysis did not stop there.  The 1996 Opinion Letter explained:

> The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1).  While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute--the regulation of the ethical practices of all businesses engaged in commerce in Indiana.  There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift

45

institutions in the United States, or any other federal objective identified in § 560.2(a).

*Id.* Like the Indiana DAP, G.L. c. 93A on its face does not purport to regulate lending and so is not preempted under § 560.2(b). Instead, it falls within the category of "contract and commercial law" under § 560.2(c)(1). In the case of the Indiana DAP, though, OTS was presented with no particular requirement that the law imposed on lending. *See id*. Because G.L. c. 93A does impose particular requirements on lenders, the analysis regarding whether its effect is "incidental" is significantly more complicated.

In 1999, OTS was faced with "the very real risk that different states could consider different practices 'unfair' or 'fraudulent' or 'deceptive,' thereby subjecting federal savings associations to multiple, sometimes conflicting, regulatory schemes." *Fultz v. World Sav. and Loan Ass'n*, 571 F. Supp. 2d at 1197-98. OTS addressed this concern in a second Opinion Letter. *See* Opinion of OTS Chief Counsel, P-99-3, March 10, 999, *available at* 1999 WL 413698 (hereinafter "1999 Opinion Letter"). This letter addressed the California Unfair Competition Act ("UCA"), which was being used to regulate three specific areas of lending operations: (1) advertising; (2) forced placement of hazard insurance; and (3) the imposition of certain loan-related fees. See *id*.

46

OTS followed the analysis of the 1996 Opinion Letter to a point, noting that the state law "is not directly aimed at federal savings associations, or lenders generally," and that it may "be viewed as a form of contract and commercial law under § 560.2(c)." *Id*.  However, OTS delved further into the third step of the analytical framework.  In contrast to the brief analysis in the 1996 Opinion Letter, the 1999 Opinion Letter went on to consider "the relationship between federal and state laws as they are interpreted and applied, not merely as they are written." *Id*.  It analyzed each of the areas of possible conflict--the restrictions that the UCA placed on advertising, forced-place insurance, and loan related fees--and determined regarding each that because the law "[sought] to set very particular requirements" on the lending operations of federally chartered banks, it had "more than an incidental impact" on their lending activities. *Id*.

Sovereign reaches too broadly in its motion for preemption of the Sturgises' claims under G.L. c. 93A.  The entire claim is not subject to blanket preemption, as "nothing in federal law preempts general deceptive practices statutes." 1996 OTS Opinion Letter.  The Sturgises bring a plethora of claims under G.L. c. 93A, through their Counterclaims and through the 93A letters that they have incorporated into Count Eleven.  Some of these may be preempted.  For instance, any attempt to shoehorn a MCCCDA claim

into G.L. c. 93A, when MCCCDA itself is preempted, *see supra* Part III(B)(8)(a), is certainly an attempt to impose a requirement that more than incidentally affects lending.  Others may not be preempted.  For instance, given that the breach of contract claim is not preempted, *see supra* Part III(B)(8)(b), a violation of 93A that is clearly part and parcel of the contract allegation is unlikely to affect lending more than incidentally.

However, neither party has briefed the particular elements of the G.L. c. 93A claim, and therefore I will not address them here but will take the matter up at a later stage in these proceedings.  For now, Sovereign's motion to dismiss the Sturgises' claims pursuant to G.L. c. 93A will be denied.

9.   Breach of Contract (Count Two)

The Sturgises allege that Sovereign breached the mortgage contracts regarding the Scootsam and Flintlock Loans.  They allege, specifically, that Sovereign breached the contracts by (1) foreclosing on the Flintlock loan without complying with G.L. c. 140D; (2) foreclosing on both properties without complying with G.L. c. 244, §§ 14, 15, or 17B; (3) foreclosing on the Flintlock loan without complying with G.L. c. 244, § 35A; and (4) foreclosing on both properties without complying with G.L. c. 183, § 27.  Counterclaims ¶¶ 165-71.  They allege that all of these violations of Massachusetts law are also breaches of contract due to paragraphs fifteen and sixteen of the mortgage

48

contracts.[13]  According to the Sturgises, Paragraph fifteen
"required Nantucket Bank/Sovereign to comply with all laws and
regulations regarding the sending of required notices to the
Sturgis[es]."  Counterclaims ¶ 166.  Paragraph Sixteen "required
Nantucket Bank/Sovereign to comply with all laws and regulations
regarding the foreclosure of the Sturgis[es'] property."
Counterclaims ¶ 167.

The Sturgises do not provide copies of the mortgages or even
a quotation of either paragraph fifteen or sixteen, so it is
difficult for me to tell if this interpretation is an accurate
reading of the actual words of the contracts.  For the purposes
of this motion I will consider as accurate the mortgage provided
by Sovereign attached to its Memorandum of Law in Support of
Motion to Dismiss Counterclaim.  Accordingly, I will treat this
component of the Motion to Dismiss as a Motion for Summary
Judgment under Fed. R. Civ. P 56 pursuant to Fed. R. Civ. P.
12(d).[14]  The Sturgises received the copy of the alleged mortgage

---

[13]  The Sturgises provide no copies of the mortgages at
issue, and Sovereign provides a copy only of the mortgage
associated with the Flintlock Loan.  Both parties, however, speak
about the contract in singular, leading me to believe that the
mortgages for both loans are identical in all relevant respects,
each being a Fannie Mae/Freddie Mac Uniform Instrument for
Massachusetts.  I will treat them as such unless until the
parties disabuse me of that notion by submitting documentation
inconsistent with this approach.

[14]  A movant is entitled to summary judgment when "the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."

from Sovereign attached to its Motion and did not contest its

accuracy in their Opposition or at the hearing on this motion,

when asked if the contents of the mortgages were contested fact.

> *a.   Violation of G.L. c. 140D*

The paragraphs of the mortgages on which the Sturgises

depend state, in relevant part:

> **15.   Notices.** . . Notice to any one Borrower shall
> constitute notice to all Borrowers unless Applicable Law
> expressly requires otherwise. . . If any notice required by
> this Security Instrument is also required under Applicable
> Law, the Applicable Law requirement will satisfy the
> corresponding requirement under this Security Instrument.
> **16.   Governing Law; Severability; Rules of Construction.**
> This Security Instrument shall be governed by federal law
> and the law of the jurisdiction in which the Property is
> located.  All rights and obligations contained in this
> Security Instrument are subject to any requirements and
> limitations of Applicable Law.  Applicable Law might
> explicitly or implicitly allow the parties to agree by
> contract or it might be silent, but such silence shall not
> be construed against agreement by contract.  In the event
> that any provision or clause of this Security Instrument or
> the Note conflicts with Applicable Law, such conflict shall
> not affect other provisions of this Security Instrument or
> the Note which can be given effect without the conflicting
> provision.

"Applicable Law," in turn, is defined by the contract to mean:

---

Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence
about the fact is such that a reasonable jury could resolve the
point in the favor of the non-moving party," and "[a] fact is
material if it has the potential of determining the outcome of
the litigation." *Farmers Ins. Exch. v. RNK, Inc.,* 632 F.3d 777,
782 (1st Cir. 2011) (quoting *Rodríguez- Rivera v. Federico Trilla
Reg'l Hosp.,* 532 F.3d 28, 30 (1st Cir. 2008)).  In evaluating a
motion for summary judgment, a court must "view the facts in the
light most favorable to the party opposing summary judgment."
*Rivera-Colón v. Mills,* 635 F.3d 9, 10 (1st Cir. 2011).

all controlling applicable federal, state and local
statutes, regulations, ordinances and administrative rules
and orders (that have the effect of law) as well as all
applicable final, non-appealable judicial opinions.

Paragraphs fifteen and sixteen do not incorporate
Massachusetts law related to foreclosures wholesale.  Instead,
paragraphs fifteen and sixteen incorporate only "Applicable Law,"
defined as "controlling" law.  The difference, in this case, is
that state law preempted by federal regulation is not
"controlling," and therefore is not incorporated by the contract.
Other courts have been similarly unwilling to interpret a general
choice of law provision to incorporate specific state law
regardless of whether it is preempted.  *See, e.g.*, *Flagg*, 396
F.3d at 186; *McAnaney*, 665 F. Supp. 2d at 160 ("The plain text of
these provisions . . . only require[s] compliance to the extent
that such laws are *applicable*.  State laws that are subject to
preemption under the terms of HOLA and its implementing
regulations are manifestly *not applicable* to federal savings
associations, and not specifically incorporated into defendants'
agreements.")

Because I find that G.L. c. 140D is preempted in the instant
case by the federal Home Owners' Loan Act, 12 U.S.C. §§ 1461 *et
seq.*, *see infra* Part II(B)(8)(a), I find it is not "Applicable
Law" and that the mortgage contract does not require compliance
with this statute.  Accordingly, to the extent that Count Two of

the Counterclaims rests on a violation of G.L. c. 140D, it is
subject to dismissal.

  b.   *Violation of G.L. c. 244, §§ 14, 15, and 17B*[15]

  The Sturgises allege that Sovereign's failure to comply with
G.L. c. 244, §§ 14, 15, and 17B, Massachusetts statutes
regulating foreclosure by sale, constitutes a breach of contract.
The Sturgises allege that these laws are also incorporated by
paragraphs fifteen and sixteen of the mortgages.

  i.   "Applicable Law" under Paragraphs Fifteen and Sixteen

  Whether these statutes constitute "Applicable Law" (namely,
whether they are preempted) is a difficult question.  Cases from
various district courts in California have held that laws
regulating foreclosure by sale are preempted by HOLA because they
regulate "servicing" and so are definitively preempted under 12
C.F.R. 560.2(b)(10).  *See, e.g.*, *McNeely v. Wells Fargo Bank,
N.A.*, No. SACV 11-01370 DOC, 2011 WL 6330170, at *2-3 (C.D. Cal.
Dec. 15, 2011); *Ahmed*, 2011 WL 1751415, at *3-4; *Ngoc Nguyen v.
Wells Fargo Bank, N.A.*, 749 F. Supp. 2d 1022, 1031-33 (N.D. Cal.
2010); *Quintero Family Trust v. OneWest Bank, F.S.B.*, No. 09-CV-

---

[15]  Sovereign notes the Sturgises' "artful" language in that
the Sturgises do not deny receiving the foreclosure notices, but
instead state that they "have no record" of receiving them.
Counterclaims ¶¶ 38-39, 52-53.  The language may be artful or it
may be infelicitous.  In any event, it should not take Sovereign
long in the course of discovery to determine what the Sturgises
remember and what they deny.  However, I am not prepared to
dismiss these claims at the motion to dismiss stage based on what
may be merely poorly chosen phrasing in an answer.

1561-IEG (WVG), 2010 WL 2618729 at *5-6 (S.D. Cal. June 25, 2010); *Taguinod v. World Sav. Bank, FSB*, 755 F. Supp. 2d 1064, 1073-74 (C.D. Cal. 2010). *But cf. Mabry v. Superior Court*, 110 Cal. Rptr. 3d 201, 213 (Cal. App. 2010) ("Given the traditional state control over mortgage foreclosure laws, it is logical to conclude that if the Office of Thrift Supervision wanted to include foreclosure as within the preempted category of *loan servicing*, it would have been explicit.  Nothing prevented the office from simply adding the words 'foreclosure of' to section 560.2(b)(10).").  I find these cases define "servicing" too broadly.

The OTS regulations do not define the term, but relevant definitions elsewhere have customarily been much more circumscribed.  For example, Congress defined "servicing" for the purposes of the Real Estate Settlement Procedures Act as:

> receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3).  Something closer to this definition seems appropriate for the OTS regulations.  If one defines "servicing" to mean everything that a loan servicer might hypothetically do, including conducting a foreclosure sale, this broad definition would render some of the other categories within 12 C.F.R. 560.2(b) unnecessary (such as escrow accounts, which

53

can be controlled by servicers, and due-on-sale clauses, which
can be enforced by servicers).  The Supreme Court has "cautioned
against reading a text in a way that makes part of it redundant."
*National Ass'n of Home Builders v. Defenders of Wildlife*, 551
U.S. 644, 669 (2007).  "Servicing" should not be read to swallow
whole every post-origination loan-related action.

A 2003 OTS Opinion Letter supports this interpretation.  The
letter addresses various provisions of the New York Predatory
Lending Law, asserting that each is preempted by HOLA.  *See*
Opinion of OTS Chief Counsel, P-2003-2, *available at* 2003 WL
24040101.  The letter discussed laws that use the New York
foreclosure process as a tool in order to compel compliance with
predatory lending laws as one category of preempted law.  In a
separate category was a list of "[r]equirements concerning
mortgage origination, refinancing, and servicing." *Id*.  The
scheme of categorization indicates that OTS does not consider
foreclosure laws to concern servicing.

Although foreclosure law is not definitively preempted under
12 C.F.R. § 560.2(b), it does affect the lending operations of
federal savings banks, triggering a presumption of preemption.
61 Fed. Reg. 50951-01, 50966.  Turning to paragraph (c),
foreclosure falls under the category of "[r]eal property law."
It therefore is not preempted to the extent that it fits within
the first section of the paragraph.   12 C.F.R. § 560.2(c).  It

is difficult to argue that foreclosure affects lending operations only "incidentally," given that it is, fundamentally, a collection mechanism for lenders.  This leads to the question whether the foreclosure laws are "otherwise consistent with the purposes of paragraph (a) of this section."  *Id*.

Paragraph (a) explains that OTS's purposes are "to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden)" and "to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation."  There is no "uniform federal scheme of regulation" regarding foreclosure, and there is no "duplication" between federal and state laws in this area. Without state law, there would be no foreclosure law whatsoever. This is not a matter of particular rates or fees left to the lenders' discretion; rather, an entire area of law would be devoid of content for federal savings associations if HOLA were found to preempt state law regulating foreclosures.  Foreclosure law is a part of "the traditional infrastructure of basic state laws that undergird commercial transactions" that OTS wanted to preserve.  61 Fed. Reg. at 50966.

OTS Opinion Letters imply as much.  Several letters from OTS Chief Counsel state that provisions that "use state foreclosure

law as [a] tool to compel compliance" with preempted lending law
are themselves preempted.  Opinion of OTS Chief Counsel, P-2003-
6, Sept. 2, 2003, *available at* 2003 WL 24040105.  For instance,
OTS Chief Counsel asserted that HOLA preempted a New York law
that "makes a violation of the predatory lending law a
foreclosure defense and requires a lender to affirmatively prove
compliance with the NY law as a prerequisite to obtain the entry
of judgment in a foreclosure action."  Opinion of OTS Chief
Counsel, P-2003-2, Jan. 3, 2003, *available at* 2003 WL 24040101.
OTS Chief Counsel similarly asserted that HOLA preempted a New
Jersey law that "requires a creditor to use the judicial
foreclosure procedures where the loan is high-cost and the
property is located in NJ, effectively barring the use of deed-
in-lieu foreclosures for high-cost loans . . . .  A violation of
the NJ Act is also a foreclosure defense as against the creditor
or any subsequent holder or assignee."  Opinion of OTS Chief
Counsel, P-2003-5, July 22, 2003, *available at* 2003 WL 24040104.

   The problem with the statutes under consideration in those
OTS Opinion Letters was that they made the foreclosure process
contingent on the banks' compliance with some other, preempted
law.  The problem was *not* the foreclosure process itself; the
assumption operating in the background of the Opinion Letters was
that federally chartered banks were using the foreclosure laws
established by the states, be it the judicial foreclosure or

deed-in-lieu in New Jersey or the foreclosure action in New York.

The basic laws undergirding the foreclosure process in each state, which in Massachusetts comprise G.L. c. 244, §§ 11-17B, are not preempted by HOLA.  Such laws are "Applicable" and therefore incorporated under the mortgage contract between Sovereign and the Sturgises.

ii.   Statutory Power of Sale under Paragraph Twenty Two

Paragraphs fifteen and sixteen of the mortgage contracts are not the only sections that incorporate the requirements of  G.L. c. 244, §§ 14, 15, and 17B.  While the mortgagors point only to these paragraphs, another section is relevant to the present discussion.  The parties agree in paragraph twenty two (Acceleration; Remedies) of the mortgage that "[i]f the default is not cured . . . Lender at its option . . . may invoke the STATUTORY POWER OF SALE . . . ."  Dkt. No. 11-2, p. 10 (capitalization in original).  It is this language that gave Sovereign the right to foreclose by sale on the Sturgises' properties in the event of default.

The term "statutory power of sale" is not defined in the mortgages.  However, the mortgages state that it is governed by Massachusetts law, and the term "statutory power of sale" is defined by statute in Massachusetts:

> The following "power" shall be known as the "Statutory Power of Sale", and may be incorporated in any mortgage by reference: But upon any default in the performance or observance of the foregoing or other condition, the

mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises . . . *first complying* with the terms of the mortgage and *with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale . . . .*"

G.L. c. 183, § 21 (emphasis added).  The Supreme Judicial Court has further defined the "statutes relating to the foreclosure of mortgages by the exercise of a power of sale."  These are G.L. c. 183, § 21, and G.L. c. 244, §§ 11-17C.  *Ibanez*, 941 N.E.2d at 49 ("Where a mortgage grants a mortgage holder the power of sale . . . it includes by reference the power of sale set out in G.L. c. 183, § 21, and further regulated by G.L. c. 244, §§ 11-17C.")  By the terms of paragraph twenty two of the mortgage contract, Sovereign bound itself to follow the statutes relating to the foreclosure of mortgages in Massachusetts, particularly G.L. c. 183, § 21, and G.L. c. 244, §§ 11-17C.

G.L. c. 244, §§ 14, 15, and 17B, are incorporated into the mortgage contracts by paragraphs fifteen, sixteen, and twenty two.  Accordingly. Sovereign's motion to dismiss Count Two with respect to the alleged violations of those statutes will be denied.

   c.   *Violation of G.L. c. 244, § 35A*

The Sturgises allege breach of contract due to violation of G.L. c. 244, § 35A, (identified by the Sturgises as Chapter 206 of the Acts of 2007 and Chapter 258 of the Acts of 2010) with respect to the Flintlock loan.  G.L. c. 244, § 35A, provides a

58

mortgagor with a 90 or 150 day "right to cure a default of a required payment . . . by full payment of all amounts that are due *without acceleration of the maturity of the unpaid balance of the mortgage*," (emphasis added) the number of days depending on whether the lender engages in good faith negotiations regarding alternatives to foreclosure.  G.L. c. 244, § 35A.  The Supreme Judicial Court, in defining the statutory power of sale incorporated by paragraph twenty two, did not include an obligation to comply with G.L. c. 244, § 35A.  *Ibanez*, 941 N.E.2d at 49.  The incorporation of this statute by the mortgage contracts is therefore dependent on whether the statute is "Applicable Law" under paragraphs fifteen and sixteen.  In other words, the claim is reduced to whether G.L. c. 244, § 35A, is preempted by HOLA.

The statute is definitively preempted under 12 C.F.R. § 560.2(b)(4).  G.L. 244, § 35A, purports to impose requirements on "[t]he terms of credit, including . . . adjustments to the . . . term to maturity of the loan . . . ."  12 C.F.R. § 560.2(b)(4).  G.L. c. 244, § 35A, denies the lender the right to accelerate the maturity of the unpaid balance of the mortgage for a period of time after default.  Any state law regarding the "term to maturity of the loan" (when the loan must be paid off) is preempted under the regulation; such preemption therefore applies to state laws regarding acceleration clauses.  OTS

Opinion Letters have similarly stated that HOLA preempts state laws regarding acceleration clauses.  *See* Opinion of OTS Chief Counsel, P-2003-6, Sept. 2, 2003, *available at* 2003 WL 24040105; Opinion of OTS Chief Counsel, P-2003-5, July 22, 2003, *available at* 2003 WL 24040104; Opinion of OTS Chief Counsel, P-2003-1, Jan. 21, 2003, *available at* 2003 WL 24040100.

Under the contract, paragraphs twenty two ("acceleration, remedies") and nineteen ("Borrower's Right to Reinstate After Acceleration") govern the acceleration of the term to maturity of the loan.  G.L. c. 244, § 35A, attempts to alter the terms provided in the contract and to regulate the term to maturity of the loan.  It is preempted and is not "Applicable Law" under the mortgage contract.  Accordingly, I will dismiss Count Two with respect to the alleged violation of G.L. c. 244, § 35A.

d.   *Violation of G.L. c. 183, § 27*

The Sturgises allege breach of contract due to violation of G.L. c. 183, § 27, regarding both foreclosures.  G.L. c. 183, § 27, requires a mortgagee to provide the mortgagor with "a written notice containing an itemized accounting of the disposition of the proceeds arising from a sale under the power of sale," including an accounting of the sale costs and proceeds, legal and other fees, and any surplus due the mortgagor.[16]  The

---

[16]   The Sturgises do not allege that Sovereign owes them a surplus from either sale.

Supreme Judicial Court, in defining the statutory power of sale incorporated by paragraph twenty two of the mortgage, did not include an obligation to comply with G.L. c. 183, § 27. *Ibanez*, 941 N.E.2d at 49. The incorporation of this statute by the mortgage contract is therefore dependent on whether the statute is "Applicable Law" under paragraphs fifteen and sixteen, which depends on whether G.L. c. 183, § 27, is preempted by HOLA.

The statute is definitively preempted under 12 C.F.R. § 560.2(b)(9), which preempts state laws purporting to impose requirements regarding disclosures. G.L. c. 183, § 27, requires that a lender send an accounting of all of the costs and fees involved in executing the foreclosure sale. Such a notice is a disclosure.[17] It is similar to a billing statement, which 12 C.F.R. § 560.2(b)(9) lists as an example of a disclosure, in that each provides an accounting, informing the debtor of the amount spent and the amount still owed by (or now owing to) the debtor.

---

[17] The Ninth Circuit recently interpreted "disclosure" in the context of the Office of Comptroller of Currency ("OCC") preemption regulations much more narrowly, to refer to "an informational statement of terms prior to entering a transaction." *Aguayo v. U.S. Bank*, 653 F.3d 912, 926 (9th Cir. 2011). However, the OTS regulations explicitly include billing statements within the disclosure category, 12 C.F.R. § 560.2(b)(9), indicating that information required to be sent after the origination of the loan is still considered to be a disclosure in this context. Moreover, *Aguayo* expressly acknowledges that the canon of construction for OTS regulations differs from that applied to the OCC regulations applied in that case, not least because "[t]he OTS, unlike the OCC, has explicit full field preemption." *Aguayo*, 653 F.3d at 921.

At least one other court has similarly held that state notice requirements imposed after a federal savings association repossesses the collateral securing a loan are preempted by HOLA.[18]  *See Crespo v. WFS Financial Inc.*, 580 F. Supp. 2d 614, 623 (N.D. Ohio 2008).

The statute is preempted and is not "Applicable Law" under paragraphs fifteen and sixteen of the mortgage contracts. Accordingly, I will dismiss Count Two of the Counterclaims to the extent that it alleges violation of G.L. c. 183, § 27.

### 10.  Violation of RESPA (Count Five)

The Sturgises allege that Sovereign violated the Real Estate Settlement Procedures Act, 12 U.S.C. 2605 *et seq.* ("RESPA"), by

---

[18]  Sovereign argues that there is no meaningful distinction between post-foreclosure notices such as that required by G.L. c. 183, § 27, and pre-foreclosure notices such as those required by G.L. c. 244, §§ 14 and 17B.  Sovereign claims that the latter should also be considered disclosures pursuant to 12 C.F.R. 560.2(b).  However, a disclosure provides information about present status or past events.  Notice, which is a broader term, also encompasses the provision of information regarding future events (e.g. a warning).  For instance, an employee might provide a fourteen day "notice" of resignation; the notice is not a "disclosure" of resignation because it is provided *before* the event in question.  The purpose of pre-foreclosure notices is not merely to keep the debtor informed about the current status of his or her loan, the payments due, etc., but to warn the debtor of the impending sale and allow the debtor to "attempt to protect its interests at the foreclosure sale, e.g., a party might take steps to stimulate the bidding or might redeem or purchase the property."  *Framingham Sav. Bank v. Turk*, 664 N.E.2d 472, 473-74 (Mass. App. Ct. 1996).  The pre-foreclosure notices, precisely because they are required before the sale and provide the debtor with the opportunity to protect his or her own interests, are necessary in order to guarantee the integrity of the entire sale process.

failing to respond properly to a letter the Sturgises sent on October 22, 2010, that self-identified as a qualified written request pursuant to RESPA.  In its response on November 3, 2010, Sovereign provided only a loan payment history and refused to provide any additional documents without a prepaid fee of five dollars per page.  Counterclaims ¶¶ 195-203.

Sovereign argues that the letter was not a proper qualified written request because the documents it requested did not pertain to the servicing of the loan.  12 U.S.C. § 2605(e) requires the servicer of a federally related mortgage loan receiving a qualified written request "relating to the servicing" of the loan to respond with information and, where appropriate, action.  The statute defines servicing as:

> receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3).  The dispute here is over whether the documents and information the Sturgises requested were related to such payments.

As Sovereign notes, a number of the requests that the Sturgises made are unrelated to servicing as defined by the statute.  For instance, the Sturgises request a copy of the Pooling and Servicing Agreement and disclosure statements provided to investors with respect to any mortgage security trust

63

that might contain the Sturgises' promissory note(s).  On the other hand, a number of the requests fit precisely within the ambit defined by the statute.  For instance, the Sturgises request an itemized statement of the charges against the loan and an itemized statement of late charges made to the account, and they ask for information regarding whether the account has been charged with Vendor's Single Interest insurance.  While Sovereign was entitled to ignore the former category of requests, it was obligated to respond to those relating to payments, fees, and the like as described in RESPA.

Neither party has provided the documents that Sovereign sent in response (aside from the cover letter) to enable meaningful analysis of whether Sovereign provided the requested information regarding servicing.  More importantly, the parties have not conducted the discovery necessary to prove whether Sovereign possessed and failed to produce relevant requested information. In the context of this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), I do not have the information necessary to decide whether Sovereign complied properly with the Sturgises' qualified written request.  Accordingly, I will deny Sovereign's motion to dismiss Count Five.

### IV.   CONCLUSION

For the reasons stated herein,

1.    Defendants' Motion to Dismiss regarding Plaintiff's failure to allege compliance with G.L. c. 244, § 14, is DENIED;

2.    Defendants' Motion to Dismiss regarding Plaintiff's failure to allege compliance with G.L. c. 244, § 17B, is GRANTED with leave to amend;

3.    Defendants' Motion to Dismiss regarding failure to allege the Sturgises' personal liability for the Scootsam loan is DENIED;

4.    Plaintiff's Motion to Dismiss Count One, parts (b)-(g) of the Counterclaims is GRANTED;

5.    Plaintiff's Motion to Dismiss Count Two of the Counterclaims is GRANTED in part and DENIED in part;

6.    Plaintiff's Motion to Dismiss Count Three of the Counterclaims is DENIED;

7.    Plaintiff's Motion to Dismiss Count Four of the Counterclaims is GRANTED;

8.    Plaintiff's Motion to Dismiss Count Five of the Counterclaims is DENIED;

9.    Plaintiff's Motion to Dismiss Count Six of the Counterclaims is GRANTED;

10.   Plaintiff's Motion to Dismiss Count Seven of the Counterclaims is GRANTED;

11.  Plaintiff's Motion to Dismiss Count Eight of the
     Counterclaims is DENIED;

12.  Plaintiff's Motion to Dismiss Count Nine of the
     Counterclaims is DENIED;

13.  Plaintiff's Motion to Dismiss Count Ten of the Counterclaims
     is GRANTED;

14.  Plaintiff's Motion to Dismiss Count Eleven of the
     Counterclaims is DENIED;

15.  Plaintiff's Motion to Dismiss Count Twelve of the
     Counterclaims is DENIED;

16.  Plaintiff's Motion to Dismiss Count Thirteen of the
     Counterclaims is GRANTED;

17.  Plaintiff's Motion to Dismiss Count Fourteen of the
     Counterclaims is DENIED;

18.  Plaintiff's Motion to Dismiss Count Fifteen of the
     Counterclaims is GRANTED with leave to amend.

     The parties shall amend their respective pleadings to
reflect the rulings made herein and the amended pleadings shall
be filed no later than April 13, 2012.[19]  On or before April 13,
2012, the parties shall submit a proposed discovery schedule.


                         **/s/ Douglas P. Woodlock**
                         DOUGLAS P. WOODLOCK
                         UNITED STATES DISTRICT JUDGE

----

     [19]  Given the directives contained in this extensive
Memorandum and Order there is no need for the amended pleadings
to be filed in the customary sequence; rather they may be filed
simultaneously.