UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SANTANDER BANK, NATIONAL | ) | |
| ASSOCIATION f/k/a | ) | |
| SOVEREIGN BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 11-10601-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL P. STURGIS and | ) | |
| CONSTANCE P. STURGIS, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
November 13, 2013


Plaintiff Sovereign Bank[1] brought this action against

Defendants Michael and Constance Sturgis to collect a deficiency

allegedly due on three promissory notes, after Sovereign

foreclosed on the properties securing the debts.  The Sturgises

responded with an array of counterclaims, and both parties moved

to dismiss the respective claims against them; I allowed those

motions in part and denied them in part with directions to amend

the pleadings.

---

[1] Effective October 17, 2013, Plaintiff changed its corporate
name to Santander Bank, National Association.  For purposes of
clarity, I will continue to refer to the Plaintiff as "Sovereign"
in this Memorandum and Order.

Both parties filed amended pleadings, and Sovereign has now moved for summary judgment on its complaint and all remaining counterclaims.  For the reasons stated below, I will grant the motion.

## I.   BACKGROUND

### A. Factual Background

The record before me discloses the following.

<u>1.</u>   <u>The Scootsam Loan</u>

On or about March 30, 2007, the Sturgises, along with a now-defunct limited liability company known as Scootsam, LLC, executed a mortgage note in favor of Sovereign in the original principal amount of $1,775,000 (the "Scootsam Loan").  The loan was commercial and represented financing for a restaurant owned by the Sturgises.  The Scootsam Loan was secured by a mortgage on certain real estate located at 5 Amelia Drive, Nantucket, Massachusetts.

Sometime in 2009, the Sturgises fell behind on payments and subsequently defaulted on the Scootsam Loan.  As a result, Sovereign initiated a foreclosure of the mortgage.  On or about August 30, 2010, Sovereign sent a notice pursuant to both Mass. Gen. Laws ch. 244 §§ 14 and 17B, entitled "Notice of Intention to Foreclose and of Deficiency After Foreclosure of Mortgage" by certified mail, return receipt requested to Michael P. Sturgis,

both individually and as a member of Scootsam, LLC, and to

Constance Sturgis.  The notices informed the Sturgises of a

foreclosure sale scheduled for October 12, 2010, and of

Sovereign's intent to collect any deficiency thereafter.  Mr.

Sturgis signed the return receipts for the notices on or about

September 2, 2010.[2]

On or about October 12, 2010, Sovereign conducted a

foreclosure sale of the real estate securing the Scootsam Loan.

The Bank was the high bidder, having bid $950,000.  Following the

foreclosure sale, on or about December 20, 2010, Sovereign

---

[2] In his deposition, Mr. Sturgis said he could not recall whether
he received the notices, but confirmed that the signatures on the
return receipts appeared to be his.  In their response to
Sovereign's statement of undisputed material facts, filed
pursuant to Local Rule 56.1, the Sturgises deny that the return
receipts produced by Sovereign "relate to any specific letter(s)
that were purportedly sent or that [Sovereign] has provided
sufficient evidence of the mailing of any specific notices."
Counsel for Sovereign Jane Fredette testified at her deposition
that she attached certified mail labels, which include
identifying numbers, to the back of each envelope containing the
notices before they were sent, and then photocopied the front and
back of each envelope.  Then, when she received a return receipt
"green card" in the mail (indicating the letter had been received
and signed for), she would match the identifying number on the
"green card" to the identifying number on the envelope, using the
photocopies.  The notices themselves do not contain any
identifying numbers, although the addresses on the notices
obviously correspond to the addresses on the outside of the
envelopes.  Ms. Fredette testified that she knew "for a fact"
that each signed green card corresponded to a specific ch. 244, §
14/17B notice.  Apart from the obdurate refusal of the defendants
to concede the obvious, there is no basis to find anything other
than that the defendants received the necessary notices.

recorded a Foreclosure Deed and Affidavit.  The affidavit indicates that Sovereign sent notice of the sale to the Sturgises and also published notice in a local newspaper on three successive weeks as required by Mass. Gen. Laws. ch. 244, § 14. On or about December 20, 2012, counsel for Sovereign, Jane Fredette, executed an affidavit entitled "Affidavit Regarding Notice of Intent to Pursue Foreclosure and Deficiency."  At her deposition, Ms. Fredette testified that she prepared the affidavit on or about November 10, 2010.  Sovereign alleges that following the foreclosure sale, the Sturgises remain indebted for a deficiency on the Scootsam Loan in the amount of $744,723.57, plus interest, costs and attorneys' fees.

   2.  The Flintlock Loan and Flintlock HELOC

   On or about December 12, 2006, the Sturgises executed a promissory note in favor of Sovereign in the original principal amount of $1,090,000 (the "Flintlock Loan").  The Flintlock Loan was secured by a first mortgage on certain real estate located at 24 Flintlock Road, Nantucket, Massachusetts, which was the Sturgises' residence.  On or about March 9, 2009, the Sturgises executed a Home Equity Line of Credit Agreement in favor of Sovereign in the original principal amount of $125,000 (the "Flintlock HELOC").  The Flintlock HELOC was secured by a second mortgage on the Sturgises' residence.

Sometime in 2010, the Sturgises fell behind on payments and subsequently defaulted under the terms of the Flintlock Loan and the Flintlock HELOC.  As a result, Sovereign initiated foreclosure proceedings with respect to the real estate securing the Flintlock Loan.  On or about February 10, 2011, Sovereign sent to the Sturgises pursuant to Mass. Gen. Laws. ch. 244, § 17B, a notice entitled "Notice of Intent to Foreclose and Your Liability in the Event of a Deficiency," by certified mail, return receipt requested.  The return receipt "green cards" returned to the bank indicate that the Sturgises received the notices on February 17, 2011.  Following the mailing of the notices, counsel for Sovereign prepared and signed an affidavit of this fact pursuant to Mass. Gen. Laws ch. 244, § 17B and placed it in his file.  Thereafter, on or about February 17, 2011 and pursuant to Mass. Gen. Laws ch. 244, § 14, the Bank sent a notice of intention to foreclose to the Sturgises by certified mail, return receipt requested, scheduling a foreclosure sale of the Flintlock real estate for March 4, 2011.  The "green cards" returned to the bank indicate that the Sturgises received these notices on or about February 23, 2011.[3]

_____

[3] Again, as with the notices sent regarding the Scootsam foreclosure sale, the Sturgises deny any connection between these "green cards" bearing what Mr. Sturgis admits appears to be his signature and the notices the Bank purportedly sent in connection with the Flintlock foreclosure sale.  As noted, Note 2, supra,

On or about March 4, 2011, Sovereign conducted a foreclosure sale of the Flintlock real estate, and purchased it with a bid of $865,000.  Following the foreclosure sale, Sovereign recorded a Foreclosure Deed and Affidavit, which indicates that Sovereign sent the required notices to the Sturgises and also published a Notice of Sale on three successive weeks as required by Mass. Gen. Laws ch. 244, § 14.  Sovereign notified the Sturgises' tenant that she should thereafter begin making her rent payments to the Bank and not the Sturgises.

Sovereign alleges that following the foreclosure sale, the Sturgises remain indebted for a deficiency on the Flintlock loan in the amount of $273,553.07, plus continuing interest, costs and attorneys' fees.  Sovereign further alleges that the Sturgies remain indebted on account of the Flintlock HELOC in the amount of $128,300.61, plus continuing interest, costs and attorneys' fees.  The Sturgises deny that "any stated amounts have been shown to be valid as amounts due and owing."

### 3. The Qualified Written Request

On or about October 18, 2010, the Sturgises, by their counsel, sent Sovereign what purported to be a Qualified Written Request ("QWR") under the Real Estate Settlement Procedures Act,

---

the defendants' efforts to avoid the obvious conclusion that they in fact received notice is contrived and groundless.

12 U.S.C. § 2601, *et seq.* ("RESPA") requesting a "myriad" of documents from the Bank.  The QWR alleged unspecified errors in the Flintlock Loan account and included a request for thirty-nine separate categories of information.  During his deposition, Mr. Sturgis admitted that he was not aware of any particular arithmetic errors in the accounting of his loan.

On or about November 2, 2010, the Bank provided a formal response to the QWR.  In the response, the Bank included a loan history for the Flintlock Loan.  The Bank offered to provide the Sturgises the additional documents requested – which in its view were not the proper subject of a QWR – for a cost of $5.00 per page.  In his deposition, Mr. Sturgis admitted that he did not recall reviewing the loan histories provided by the Bank to check for errors.

### 4.   The Set-Off

On or about April 26, 1993, Mr. Sturgis opened a depository account with Nantucket Bank.[4]  In connection with the creation of the account, Mr. Sturgis signed a signature card that stated: "The undersigned hereby agree to the Rules and Regulations of Nantucket Bank, Nantucket, MA, and any amendments hereafter made."

---

[4] Nantucket Bank was acquired by Sovereign in 2004, and subsequently began doing business under the name "Nantucket Bank, a Division of Sovereign Bank."

At the time of the set-off, the Deposit Account Agreement provided that: "We may set-off funds in your account and any other accounts held by you, jointly or individually, to pay any debt you may owe us."  On or about October 15, 2010, the Bank sent notice to the Sturgises, by certified mail, that it had set-off the account of Mr. Sturgis in the amount of $4,333.41 and applied this amount against the balance owed under the Scootsam Loan.

### 5.  Failed Workout

At some point prior to the Scootsam foreclosure sale, Michael Sturgis engaged in conversations with Bret Bokelkamp, a Vice President of the Bank, in an attempt to modify the loan and avoid foreclosure.  Mr. Sturgis testified in his deposition that, during the course of those conversations, Mr. Bokelkamp made a statement (or statements) to the effect that the Bank and Mr. Sturgis were "partners together in this, and that [they] would work out something satisfactory to move forward."  Mr. Sturgis says he interpreted this general statement to mean that "[Sovereign] would be able to assist me in moving forward with the [restaurant] business," and as a result, Mr. Sturgis eschewed any attempt to find a buyer for the restaurant or refinance the loan with another lender in order to avoid foreclosure. Specifically, Mr. Sturgis testified that "when I was assured by

-8-

Mr. Bokelkamp that things would work out, I did not pursue anybody else until, again, I felt that it was at the last possible minute."  Mr. Sturgis provided Mr. Bokelkamp with information about the restaurant's finances as well as critical acclaim it had received, which he felt supported his view that "the restaurant was well run and [he] needed a bridge to get through this economic time."  He further testified that "I was led to believe by Mr. Bokelkamp – at no point in time did [Mr. Bokelkamp] lead me to believe that the bank was not going to work with me on this information."  He says it thus came as a surprise to him when Mr. Bokelkamp informed him "that [Sovereign's] idea of helping me was for me to pay the mortgage off totally and refinance with someone else."  At the point Mr. Sturgis had this realization, it was too late for him to find a buyer or attempt to refinance and avoid foreclosure.

## B. Procedural History

Sovereign originally filed this action on April 8, 2011, seeking deficiency judgments on the Scootsam Loan in the amount of $747,723.57, on the Flintlock Loan in the amount of $273,553.07, and on the Flintlock HELOC in the amount of $128,300.61, plus continuing interest, costs and attorneys' fees. The Sturgises responded with fifteen counterclaims alleging various unlawful acts committed by Sovereign in the course of

servicing the loans and foreclosing on the mortgages.  Both parties filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  By Memorandum and Order dated March 22, 2012, *Sovereign Bank* v. *Sturgis*, 863 F. Supp. 2d 75 (D. Mass. 2012), I dismissed the complaint with leave to amend, dismissed some but not all of the counterclaims asserted by the Sturgises (including one with leave to amend), and directed the parties to amend their respective pleadings to reflect my rulings on the motions to dismiss.  *Id.* at 105.

In their Amended Counterclaims, the Sturgises seek a declaratory judgment that they are not liable on any of the notes (Count I), and make the following claims for damages: breach of contract arising from Sovereign's alleged non-compliance with Mass. Gen. Laws. ch. 244 (Count II); slander of title arising from Sovereign's alleged noncompliance with Mass. Gen. Laws. ch. 244, § 15 (Count III); violation of RESPA, 12 U.S.C. § 2601, *et seq.*, arising from Sovereign's alleged failure to respond adequately to the Sturgises' QWR (Count IV); unlawful set-off for withdrawing funds from Mr. Sturgis' depository account (Count V); intentional infliction of emotional distress arising from Sovereign's alleged unlawful foreclosure of the Sturgises' properties (Count VI); violation of Mass. Gen. Laws. ch. 93A (Count VII); and breach of the implied covenant of good faith and

fair dealing contained in the mortgage contract (Count VIII).
The parties having completed discovery, Sovereign now moves for
summary judgment in its favor on the amended pleadings.

## II.    STANDARD OF REVIEW

A movant is entitled to summary judgment "if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed.
Rule Civ. P. 56(a).  If the movant meets this burden, "the
opposing party can then defeat the motion by showing that there
is a genuine issue of material fact."  *Rivera-Colon* v. *Mills*, 625
F.3d 9, 12 (1st Cir. 2011).  An issue is genuine "if 'a
reasonable jury could resolve the point in favor of the nonmoving
party.'"  *Tropigas de P.R., Inc.* v. *Certain Underwriters at
Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting
*McCarthy* v. *Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.
1995)).  A fact is material if "its existence or nonexistence has
the potential to change the outcome of the suit." *Borges ex rel.
S.M.B.W.* v. *Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010).

"In evaluating whether there is a genuine issue of material
fact, the court examines the record — pleadings, affidavits,
depositions, admissions, and answers to interrogatories — viewing
the evidence in the light most favorable to the party opposing
summary judgment."  *Id*. (citations omitted).  However, I may

"afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas de P.R., Inc.*, 637 F.3d at 56 (quoting *Rogan* v. *City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)). Thus, in order to meet its burden, the nonmoving party "must point to competent evidence and specific facts." *Tropigas de P.R., Inc.*, 637 F.3d at 56 (citation omitted).

## III.   ANALYSIS

The Sturgises do not deny that they defaulted under the terms of their various loans with Sovereign. As a result, the Sturgises are liable for all amounts due under the loans absent an affirmative defense or counterclaim absolving them of liability. Although the Sturgises assert nine affirmative defenses and eight counterclaims, the majority of both the defenses and counterclaims derive from the premise that the foreclosures of the mortgages securing the loans were defective. More specifically, the Sturgises claim various violations of Mass. Gen. Laws. ch. 244, § 14, the Massachusetts statute governing foreclosure by sale; Mass. Gen. Laws. ch. 244, § 15, the Massachusetts statute requiring the recordation of an affidavit demonstrating compliance with the statutory power of sale; and Mass. Gen. Laws. ch. 244, § 17B, the Massachusetts

statute requiring notice to the mortgagor prior to pursuing a deficiency action.

Mass. Gen. Laws. ch. 244, § 14, requires that a mortgagee send notice of the foreclosure to the mortgagor at least fourteen days prior to the date of the sale.[5]  Mass. Gen. Laws. ch. 244, § 17B, in turn, provides that "[n]o action for a deficiency shall be brought . . . unless a notice in writing of the mortgagee's intention to foreclose the mortgage has been mailed . . . together with a warning of liability for the deficiency. . . ." Mass. Gen. Laws. ch. 244, § 17B.  Finally, Mass. Gen. Laws. ch. 244, § 15, provides that: "[t]he person selling, or the attorney

---

[5] Mass. Gen. Laws. ch. 244, § 14 provides more fully, in relevant part:

> The mortgagee or person having estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal or the legal guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person, may, upon breach of condition and without action, perform all acts authorized or required by the power of sale; provided, however, that no sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale, notice of the sale has been published once in each of 3 successive weeks, the first publication of which shall be not less than 21 days before the day of sale, in a newspaper published in the city or town where the land lies or in a newspaper with general circulation in the city or town where the land lies and notice of the sale has been sent by registered mail to the owner or owners of record of the equity of redemption as of 30 days prior to the date of sale, said notice to be mailed by registered mail at least 14 days prior to the date of sale . . . .

duly authorized by a writing . . . shall, after the sale, cause a copy of the notice and his affidavit, fully and particularly stating his acts, or the acts of his principal or ward, to be recorded in the registry of deeds for the county or district where the land lies. . . ." G.L. c. 244, § 15. "If the affidavit shows that the requirements of the power of sale and of the statute have in all respects been complied with, the affidavit or a certified copy of the record thereof, shall be admitted as evidence that the power of sale was duly executed." *Id.*

To avoid redundancy, and following the structure of the parties' briefs, I will frame the bulk of my discussion in terms of the adequacy (or inadequacy) of the foreclosure process, addressing any defenses or counterclaims that allege defects in the foreclosures where appropriate. I will then separately address those counterclaims that do not directly depend on the propriety of the foreclosures.

**A. The Scootsam Foreclosure**

1. Applicable Law

For the first time on summary judgment, the Sturgises argue that the Scootsam mortgage is governed by Pennsylvania law.  The Sturgises make this claim based on a section in the Scootsam mortgage contract entitled "Governing Law," which states: "This Mortgage shall be governed by and construed in accordance with the laws of the state in which the Mortgagee's principal office is located."  At the time the Scootsam mortgage was executed, Sovereign's principal office was (and continues to be) located in Wyomissing, Pennsylvania.  Accordingly, the Sturgises argue, where the foreclosure of the Scootsam mortgage was indisputably conducted pursuant to Massachusetts law, the foreclosure "was and is void."

Neither Sovereign nor the Sturgises provided a copy of the Scootsam mortgage in connection with the motion to dismiss practice conducted earlier in this litigation.  Sovereign provided a copy only of the Flintlock mortgage, which is a Fannie Mae/Freddie Mac Uniform Instrument for Massachusetts containing no similar choice of law provision.  In ruling on the motions to dismiss, I noted that both parties "[spoke] about the contract in singular" and I accordingly operated under the assumption that

the Flintlock and Scootsam mortgage contracts were "identical in all relevant respects." *Sturgis*, 863 F. Supp. 2d at 98 n.13.

Apart from pointing to the choice of law provision in the Scootsam mortgage contract, the Sturgises offer no legal authority or argument supporting the application of Pennsylvania substantive law – as a matter of Pennsylvania choice of law protocols – to the foreclosure of the Scootsam mortgage.[6] Sovereign advances two arguments against applying Pennsylvania substantive law as a matter of choice of law:  First, that black letter choice of law rules compel the application of Massachusetts law to the foreclosure of a mortgage on real property located in Massachusetts; and second, that specific language in the mortgage contract other than the choice of law provision compels the application of Massachusetts law.  I will address both arguments.[7]

---

[6] The Sturgises' citations to cases discussing subject matter jurisdiction and standing are inapposite.

[7] Sovereign argues additionally that the Sturgises are judicially estopped from claiming that Pennsylvania law applies at this point in the litigation where the entire theory of their case up to this point has been predicated on the premise that Massachusetts law governs the foreclosure.  Because I conclude that Massachusetts law governs the foreclosure as a matter of Pennsylvania choice of law doctrine, I need not address this argument.  I note however, that this belated argument, sprung for the first time by defendants in summary judgment practice, is of a piece with defendants' assertion of strained and contrived contentions.

It is clear that as a general matter, real property questions, including those concerning real estate foreclosures, are governed by the law of the jurisdiction within whose territory the property is located.  *See* Restatement (Second) of Conflict of Laws §§ 228, 229, 254 (1971).  Specifically in regard to foreclosures, Restatement § 229 provides that: "[t]he method for the foreclosure of a mortgage on land and the interests in the land resulting from the foreclosure are determined by the local law of the situs."

Although I could find no Pennsylvania case explicitly adopting Restatement § 229 or discussing choice of law doctrine specifically with respect to mortgages or foreclosures on real property, there is little doubt that general Pennsylvania choice of law rules compel the application of Massachusetts law to the foreclosures in the instant case.

Pennsylvania employs a two-step hybrid framework to choice of law questions.  *Mezamane* v. *Winfrey*, 693 F. Supp. 2d 442, 467 (E.D. Pa. 2010).  Under the first step of this analysis, a court must determine whether a "real conflict" exists between the respective laws.  *Hammersmith* v. *TIG Ins. Co.*, 480 F.3d 2230, 230 (3d Cir. 2007).  A real conflict exists where the application of each state's substantive law produces a contrary result.  *Id.*

Where a conflict exists, a court must proceed to the second step of the conflict inquiry and determine whether the conflict is "true," "false," or "unprovided for." *Hammersmith*, 480 F.3d at 230. A "true" conflict exists where "*both* jurisdictions' interests would be impaired by the application of the other's laws." *Id.* (citing *Cipolla* v. *Shaposka*, 267 A.2d 854, 856 (Pa. 1970)) (emphasis in original). A "false" conflict exists where only one state has an actual interest in applying its law. *See Hammersmith*, 480 F.3d at 229-30 (citing *Lacey* v. *Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991)). An "unprovided for" conflict exists where neither state's interest would be impaired if its laws were not applied. *Hammersmith*, 480 F.3d at 230 n.9 (citing *Garcia* v. *Plaza Oldsmobile Ltd.*, 421 F.2d 216, 220 (3d Cir. 2005)).

I conclude that there is an actual conflict between the foreclosure laws of Massachusetts and Pennsylvania, where Massachusetts law provides for a statutory power of sale, *see* Mass. Gen. Laws ch. 183, § 21, and Pennsylvania law instead requires judicial foreclosure, *see* Pa. Stat. Ann. § 1680.402c; Pa. R. C. P. 1141 *et. seq.*. However, at least on the facts of this case, this conflict is best categorized as a "false" conflict. Pennsylvania has no interest in seeing its foreclosure law applied to a foreclosure on real property located in

-18-

Massachusetts, where the mortgagors are residents of
Massachusetts, where the mortgage contract and underlying note
were executed in Massachusetts, and where the manifest
understanding of the parties[8] was that the mortgage and any
eventual foreclosure were governed by substantive Massachusetts
law.

As the Supreme Court of Pennsylvania has pronounced, "[i]t
is a principle of private, international law, fortified by a
great mass of authority, that all questions relating to the
transfer of title to land wherever arising will be governed by
the laws of the place where the land is situated." *In re
Dublin's Estate*, 101 A.2d 731, 733 (Pa. 1954) (citing *Wolfe* v.
*Lewisburg Trust & Safe Deposit Co.*, 158 A. 567 (Pa. 1931)); *In re
Lawrence's Estate*, 20 A. 521 (Pa. 1890); *Donaldson* v. *Phillips*,
18 Pa. 170 (1851)).

Although not explicitly addressing the question I now
confront, the Supreme Court of Pennsylvania has stated in the
context of trust law that "[where] the obligation and the
property securing [the trust's] payment were [located in Delaware
County, Pennsylvania] . . . resort to the local law was required
to perfect the assignment of the mortgage, and, if necessary, its

---

[8] Apart from the belatedly asserted "Governing Law" provision in
the mortgage contract.

foreclosure." *In re Johnson's Estate*, 4 A.2d 157, 159 (Pa. 1939) (citing Beale, Conflict of Laws, Vol. 1, §§ 118C.40, 118C.41; Restatement, Conflict of Laws, §§ 297, 299).

Similarly, with respect to the law of wills, the Supreme Court of Pennsylvania has observed that:

> [t]he situs state of realty is generally entitled to severest deference . . . . That the laws of the situs state should govern the devise of real property is a sound principle, articulated in both Restatements of Conflict of Laws, and in the consistent statements of this Court.  The policy served is the right of the situs state to regulate the transfer of title to land between its borders. . . . The situs state [should not be] denied its inherent right to regulate title.

*In re Estate of Janney*, 446 A.2d 1265, 1266 (Pa. 1982) (internal citations omitted).  It is therefore evident that Pennsylvania has no interest in imposing its substantive foreclosure laws on the realty at issue in this case.

Perhaps because the "law of the situs" rule is so well engrained in the common law, I could find only one reported decision from any American jurisdiction discussing the effect on this rule of a choice of law provision in a mortgage contract that calls for the application of foreign law.  In *Harbor Funding Corp.* v. *Kavanagh*, 666 A.2d 498, 500 (Me. 1995), the Maine Supreme Judicial Court, with Judge Lipez sitting on the panel, held that Maine law applied to a foreclosure on real property located in Maine despite a provision in the mortgage calling for

the application of Massachusetts law in the event of default. The court reasoned that "[b]ecause a mortgage creates an interest in land and because each state has an interest in preserving the right to freely transfer land for purposes of security, the method of foreclosure is uniformly governed by the law of the situs." *Id.*

Moreover, I agree with Sovereign that the mortgage contract on the whole suggests that it is a Massachusetts form of mortgage and anticipates the application of Massachusetts foreclosure laws.[9]  Certain terms incorporated into the Scootsam mortgage contract, particularly the reference to the "STATUTORY POWER OF SALE," have no application under Pennsylvania law, which requires judicial foreclosure.  *See* Pa. Stat. Ann. § 1680.402c; Pa. R. C. P. 1141 *et. seq.*  Rather, the terms "STATUTORY POWER OF SALE" and "STATUTORY CONDITION," which are used but not defined in the instrument itself, are best understood as references to Mass. Gen. Laws ch. 183, §§ 20 and 21, which define those terms and

---

[9] I also note that the "Governing Law" provision does not unequivocally invoke Pennsylvania law, but instead references the "laws of the state in which the Mortgagee's principal office is located."  While there is no dispute that Sovereign's principal office was located in Pennsylvania at the time of the execution of the Scootsam mortgage, as far as the Sturgises were concerned, they were granting a mortgage to Nantucket Bank, a Division of Sovereign Bank.  There is no question that the Sturgises believed the Scootsam mortgage and the foreclosure on that mortgage were governed by Massachusetts law.

expressly provide for their incorporation by reference in Massachusetts mortgage contracts.  *See* Mass. Gen. Laws ch. 183, §§ 20 and 21.

Finally, I note that of relevance to the present matter, Comment *e* to Restatement § 229 provides: "[i]ssues which do not affect any interest in the land, although they do relate to the foreclosure, are determined, on the other hand, by the law which governs the debt for which the mortgage was given."  One example of such an issue is "the mortgagee's right to hold the mortgagor liable for any deficiency remaining after foreclosure. . . ." *Id.*  Here, because the Scootsam note is silent as to applicable law, under general conflict of law principles, it is governed by the law of Massachusetts, the jurisdiction in which it was executed.  *See F.D.I.C.* v. *Henry*, 818 F. Supp. 452, 454-55 (D. Mass. 1993) (citing Restatement §§ 196-188) (holding notice under Mass. Gen. Laws ch. 244, § 17B was required to pursue deficiency on note governed by Massachusetts law, following foreclosure conducted under New Hampshire law on real property located in New Hampshire); *see also Walling* v. *Cushman*, 130 N.E. 175, 176 (Mass. 1921).  Accordingly, Sovereign's deficiency action is also clearly governed by Massachusetts law.

### 2.  Compliance with G.L. c. 244, §§ 14, 15 and 17B

With respect to the Scootsam foreclosure, the Bank contends that it satisfied all legal requirements.  On or about August 30, 2010, the Bank sent by certified mail a unified "Notice of Intention to Foreclose and of Deficiency After Foreclosure" with regard to the scheduled October 14, 2010 sale.  The Bank contends this notice satisfied the requirements of both Mass. Gen. Laws ch. 244, §§ 14 and 17B.  It was sent sufficiently in advance of the foreclosure sale to meet the respective fourteen and twenty-one day requirements of those two statutes.  Mr. Sturgis signed for the notices on behalf of himself and Mrs. Sturgis.  The published notice required by § 14 was published in the Nantucket Inquirer and Mirror on September 2, 9 and 16, 2010.  On or about December 20, 2010 a foreclosure deed and affidavit pursuant to Mass. Gen. Laws ch. 244, § 15 were recorded in the Nantucket Registry of Deeds.  The documents were duly signed and notarized by a representative of the Bank, Bret Bokelkamp, who was a Vice President of the Bank and authorized to act on its behalf.

The Sturgises assert, and the Bank concedes, that it failed to execute an affidavit within thirty days of the foreclosure sale, as required by Mass. Gen. Laws ch. 244, § 17B, attesting that it complied with the notice requirement of that statute.  An

affidavit was not executed until December 20, 2012.[10]  The
Sturgises argue that the Bank's failure to execute the § 17B
affidavit within the thirty day period set forth in the statute
bars the Bank from pursuing a deficiency action.  The Bank
counters that it is not barred from pursuing a deficiency action,
where the purpose of the § 17B affidavit is only to provide
"prima facie evidence" that the required notice of the intent to
pursue a deficiency was given, and where the Bank here has
produced copies of the actual § 17B notices as well as the
returned "green cards" signed by Mr. Sturgis evidencing receipt.

Mass. Gen. Laws ch. 244, § 17B provides in relevant part:

> No action for a deficiency shall be brought . . . unless a
> notice in writing of the mortgagee's intention to foreclose
> the mortgage has been mailed, postage prepaid, by registered
> mail with return receipt requested, to the defendant sought
> to be charged with the deficiency at his last address then
> known to the mortgagee, together with a warning of liability
> for the deficiency . . . not less than twenty-one days
> before the date of the sale under the power in the mortgage,
> and *an affidavit has been signed and sworn to, within thirty
> days after the foreclosure sale, of the mailing of such
> notice*.  A notice mailed as aforesaid shall be a sufficient
> notice, and *such an affidavit made within the time specified*

---

[10] The Sturgises urge me to discredit Ms. Fredette's averment in
her affidavit that she had "previously prepared this Affidavit,
but had neglected to sign it and include it in [her] file," as
well as her deposition testimony that she prepared the affidavit
on or about November 10, 2010.  Because I conclude that the Bank
can properly pursue a deficiency action on the facts of this case
despite the untimely affidavit, any factual dispute over whether
and when the affidavit was "previously prepared" is not a
material one.

> *shall be prima facie evidence in such action of the mailing*
> *of such notice*.

Mass. Gen. Laws ch. 244, § 17B (emphases added).

The § 17B notice "has been described as a 'condition precedent' to a deficiency action, having the practical effect . . . of treating a foreclosure sale as a complete discharge of the mortgage debt, thwarting a post-foreclosure deficiency judgment, absent statutory notice of intent to pursue a deficiency." *Framingham Sav. Bank* v. *Turk*, 664 N.E.2d 472, 474 (Mass. App. 1996) (citing *Guempel* v. *Great American Ins. Co.*, 420 N.E.2d 353, 355–56 (Mass. App. 1981)). The notice requirement has been strictly construed, with courts concluding that written notice of the form prescribed in § 17B is required even where the mortgagor has actual notice (in some other form) of the mortgagee's intent to pursue a deficiency. *See Bead Portfolio, LLC* v. *Follayttar*, 372 N.E.2d 372, 373 (Mass. App. 1999); *Framingham Sav. Bank*, 664 N.E.2d at 474.

While I have found no reported decisions discussing the effect of a deficient or untimely § 17B affidavit, several decisions discussing the analogous affidavit requirement of Mass. Gen. Laws ch. 244, § 15 are instructive. Applying Gen. Sts. c. 140, § 42, (a predecessor version of Mass. Gen. Laws ch. 244, § 15, that, like the current version of § 17B, set a thirty day

-25-

limit for filing an affidavit),[11] the Supreme Judicial Court in *Field* v. *Gooding*, 106 Mass. 310 (1871), held that the failure to timely file the required affidavit did not invalidate the foreclosure sale or prevent vesting of title.  *See id.* at 312. The court observed that "the [affidavit] provision is intended to secure the preservation of evidence that the conditions of the power of sale named in the deed have been complied with."  *Id.*

Much more recently, the Supreme Judicial Court noted in a case where the mortgagor challenged the sufficiency of a § 15 affidavit, that "[o]f significance to the issue on appeal is the absence of any assertion by [the mortgagor] by affidavit or other acceptable alternative, to the effect that he did not receive proper notice of the foreclosure sale, or that [the mortgagee] failed in any respect to comply with the notice requirements of [Mass. Gen. Laws ch.] 244, § 14."  *Federal Nat'l Mortg. Ass'n* v. *Hendricks*, 977 N.E.2d 552, 555 (Mass. 2012).  The SJC further stated that "[a] deficient [§ 15] affidavit may be cured by extrinsic evidence that the power of sale was exercised properly and the foreclosure was valid."  *Hendricks*, 977 N.E.2d at 555 (citing *O'Meara* v. *Gleason*, 140 N.E.2d 426 (Mass. 1923)).

---

[11] The time limit under § 15 was eliminated in 1994.  *See* 1994 Mass. Acts ch. 341.

Mass. Gen. Laws ch. 244, § 17B states that notice of an intent to pursue a deficiency mailed as required is "sufficient notice," and an affidavit of the mailing is "prima facie evidence . . . of the mailing."  Mass. Gen. Laws ch. 244, § 17B.  By its own terms, as with an affidavit recorded pursuant to § 15, an affidavit executed pursuant to § 17B is merely evidence that the mortgagee complied with the requirements of § 17B.  *Id.; see Hendricks*, 977 N.E.2d at 558 (an affidavit that meets the requirements of § 15 "is not conclusive proof of compliance with [Mass. Gen. Laws ch.] 244, § 14 . . . . It is merely evidence that the power of sale was duly executed" (citations omitted)).  Accordingly, I conclude that the timely preparation of a § 17B affidavit is not a condition precedent to a deficiency action, but rather a matter of proof.[12]

---

[12] Furthermore, I note that even if strict compliance with the affidavit requirement of § 17B were considered a condition precedent to a deficiency action, failure to comply with that requirement would at most insulate the mortgagor from post-foreclosure liability on the note.  *See Sovereign Bank* v. *Sturgis*, 863 F. Supp. 2d 75, 80 (D. Mass. 2012) ("A foreclosure can be conducted properly without the mortgagee sending a § 17B notice; it is only if the mortgagee wishes to preserve the right to pursue a deficiency action that such a notice is necessary."); *Framingham Sav. Bank*, 664 N.E.2d at 474 ("[T]he § 17B notice is required only in cases when a foreclosure sale may establish a deficiency — but in that case the notice is a must.").  Because noncompliance with § 17B would not, by itself, invalidate the underlying foreclosure, it could not serve as a basis for counterclaims seeking to invalidate the foreclosure or which are premised on the invalidity of the foreclosure.

Contrary to what the Sturgises contend, my conclusion does not render the affidavit requirement in § 17B "mere surplusage" any more than the decisions of the Supreme Judicial Court do with respect to the § 15 affidavit requirement.  Given the evidentiary power of such affidavits, it is and will continue to be best practice for a foreclosing mortgagee to timely execute them. However, I will not read § 17B to impose a disabling penalty that it does not in fact impose.

In the event of an untimely or otherwise defective affidavit, a mortgagee intent on pursuing a deficiency can prove by other means that it complied with the notice requirement imposed by § 17B, for example, by producing copies of the actual § 17B notices that were mailed and return receipts indicating they were received.  The Bank has done so here.

As to the § 17B notices themselves, the Sturgises' attempt to create a genuine issue of material fact regarding whether they received the notices fails.  Ms. Fredette's deposition testimony regarding the process by which she matched the notices mailed under §§ 14 and 17B to the return receipt "green cards" is quite clear.  In his deposition, Mr. Sturgis identified his signatures on those green cards; it is irrelevant that he does not "recall" receiving the corresponding notices absent some actual proof (of which there is none) that the Sturgises did not in fact receive

the notices.  Finally, the assertion by the Sturgises that the

Bank has no way of proving that the notices, copies of which are

contained in the record, were actually included in the envelopes

mailed to the Sturgises (envelopes, which, correspond by tracking

number to the return receipt green cards) is exactly the kind of

"conclusory allegation[], improbable inference[], [and] rank

speculation" that I need not (and cannot) consider on summary

judgment.  *See Ahern* v. *Shinseki*, 629 F.3d 49, 54 (1st Cir.

2010).  *See generally* Notes 2 and 3, *supra*.

### 3. Notice of Default

The Sturgises additionally argue that "there is no evidence

or documentation contained anywhere in Plaintiff's pleadings"

that establishes that a default existed for ten days (as required

by the terms of the mortgage) before the Bank accelerated the

Scootsam loan.  Yet Mr. Sturgis admitted in his deposition that

his signature appears on certified mail return receipts

accompanying a May 5, 2010 demand letter informing the Sturgises

that the Bank had elected to accelerate the Scootsam loan as a

result of default.  Mr Sturgis testified in his deposition that

the restaurant began having financial difficulties in "maybe late

2008, 2009," and in their counterclaims, the Sturgises admit that

"[i]n late 2009" they "fell behind in their payments."  There is

therefore no genuine dispute of material fact regarding whether

ten days elapsed between when the Sturgises defaulted on the Scootsam loan and when the Bank elected to accelerate the loan.

**B. The Flintlock Foreclosure**

1.   Compliance with G.L. c. 244, §§ 14, 15 and 17B

The Bank contends that the foreclosure on the real estate associated with the Flintlock mortgage complied with all statutory requirements.  On February 10, 2011, the Bank sent both Mr. and Mrs. Sturgis a notice of intention to collect a post-foreclosure deficiency pursuant to § 17B.  Mr. Sturgis signed the return receipt for both his and his wife's notices.  Stephen Hayes, counsel for the Bank, executed an affidavit pursuant to § 17B regarding the sending of such notice on February 8, 2011, and included it in his file.

On or about February 17, 2011, the Bank sent the Sturgises a notice of intention to foreclose pursuant to § 14.  The Bank published notice of the sale in the Nantucket Inquirer and Mirror on February 3, 10 and 17, pursuant to § 14.  A foreclosure sale was conducted on March 4, 2011, and a foreclosure deed and affidavit were recorded in the Nantucket Registry of Deeds on that day, pursuant to § 15.  The deed and affidavit were signed by a Senior Vice President of the Bank, Zona Tanner-Butler.

2.   <u>Compliance with Notice of Default as Required by</u>

<u>Mortgage Contract</u>

The principal attack the Sturgises make on the Flintlock

foreclosure is that the notice of default sent to Mr. Sturgis

(but not the one sent to Mrs. Sturgis) failed to "inform" him of

"the right to bring a court action to assert the non-existence of

a default or any other defense of Borrower to acceleration and

sale," as required by paragraph 22 of the mortgage contract.

Accordingly, the Sturgises argue, the acceleration of the

mortgage thereunder is void as is the foreclosure sale.  *See U.S.*

*Bank Nat'l Ass'n* v. *Ibanez*, 941 N.E.2d 40, 49-50 (Mass. 2011)

(quoting *Moore* v. *Dick*, 72 N.E.2d 967 (Mass. 1905)) ("we adhere

to the familiar rule that 'one who sells under the power [of

sale] must follow strictly its terms.  If he fails to do so there

is no valid execution of the power, and the sale is wholly

void.'").

Here, the Sturgises are simply taking advantage of what

appears to be a nothing more than a clerical error that occurred

during document production.  It is apparent that both Mr. and

Mrs. Sturgis were sent identical notices of default that informed

them of their right to bring a court action.  Sovereign

represents that in connection with the preparation of Exhibit "E"

to the Affidavit of Emmy Hamilton, which features copies of the

notices of default, the middle page of the notice addressed to

Mr. Sturgis was inadvertently omitted.  The notices addressed to

Mr. and Mrs. Sturgis are identical in every respect except that

the one addressed to Mr. Sturgis is missing the middle page.

Sovereign subsequently submitted a corrective affidavit

containing the missing page.  There is nothing in the record to

suggest this involved anything other than a document production

glitch.  This is hardly a "genuine" dispute of material fact.[13]

---

[13]  The defendants have moved to strike both the original
Affidavit of Emmy Hamilton [DN 50] and the exhibits attached
thereto, and the corrective affidavit of Zona Tanner-Butler [DN
63] and the exhibits attached thereto.  The focal point of this
motion is the notices of default with respect to the Flintlock
loan that were mailed to the Sturgises by certified mail on
December 17, 2008.  As grounds for the motion, the defendants
argue essentially that neither Hamilton nor Butler had personal
knowledge of the facts attested to in their affidavits, and that
the exhibits attached thereto were not properly authenticated as
business records falling within the business records exception to
the hearsay rule, see Fed. R. Evid. 803(6).  The defendants'
argument is erroneous.
     In her affidavit, Ms. Hamilton states that in her position
as Vice President, Bank Operations for Nantucket Bank, she was
one of the Bank officers assigned to the Sturgises' accounts,
with her primary responsibility being the Sturgises residential
loans (the Flintlock loan and Flintlock HELOC).  She attests
based upon her "personal knowledge and a review of the records of
the Nantucket Bank division of Sovereign Bank, N.A., made and
kept in the ordinary course of business," that "the Bank gave
notice of default to the Sturgises [and that] a true and accurate
copy of the notice of default is annexed hereto as Exhibit 'E.'"
     The fact that Ms. Hamilton does not attest personally to
having mailed the notices of default is irrelevant.  In light of
her status as a Bank officer assigned to the Sturgises' loans and
her attestation that her affidavit was made upon personal
knowledge and a review of the records of the Bank made and kept
in the ordinary course of business, I find her to be a "qualified

### 3.  Flintlock HELOC

The Sturgises argue that the Bank failed to send a notice of default as required by paragraph 22 of the HELOC mortgage contract, which is identical to the Flintlock mortgage contract. The problem with this argument is that the terms of the HELOC *note* (as opposed to the *mortgage*) do not require notice of default, instead providing only that "[y]ou will be in 'default' if (a) [y]ou fail to make payments according to the terms of this Agreement."  The Sturgises also appear to argue that the bank never sent a § 17B notice with respect to the Flintlock HELOC. This argument similarly fails because the Bank never foreclosed on the HELOC mortgage.  Therefore, no obligation under § 17B

---

witness" for purposes of Fed. R. Evid. 803(6).

For her part, Ms. Tanner-Butler testified in her deposition that, as the Senior District Retail Director of the Nantucket Bank division of Sovereign Bank, she directed Ms. Hamilton to send required notices to the Sturgises prior to the foreclosure and she herself executed the Foreclosure Deed and Affidavit for the Flintlock foreclosure.  She is therefore as equally qualified as Ms. Hamilton (who has since left the Bank's employ) to offer as an exhibit to her corrective affidavit the complete version of the default notice sent to Mr. Sturgis.

The defendants' motion to strike will be denied.  Further, I note that in their response to paragraph five of Sovereign's statement of material facts pursuant to Local Rule 56.1, the defendants offer only a blanket denial that the Bank provided proper notice of default with respect to the Flintlock loan. Their response contains no references to "affidavits, depositions or other documentation" as required by Local Rule 56.1. Accordingly, by strict application of Local Rule 56.1, it would be within my discretion to deem that fact uncontested on summary judgment. *See Mariani-Colon* v. *Department of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

arises.  *See BankBoston, N.A.* v. *Yodice*, 763 N.E.2d 80, 82 (Mass. App. 2002) (discerning no intent under § 17B "to require holders of multiple mortgages, who were exercising rights under a senior instrument, to give notice regarding rights they were *not* exercising under junior instruments.").

### C. RESPA Claim

Sovereign moves for summary judgment on the Sturgises' counterclaim alleging that it violated the Real Estate Settlement Procedures Act, 12 U.S.C. 2605 *et seq.* ("RESPA"), by failing to respond adequately to a letter the Sturgises (through their counsel) sent on October 22, 2010, that self-identified as a qualified written request pursuant to RESPA.  The letter alleged unspecified "errors which are alleged to have occurred in the origination, possible transfer of ownership, process, servicing and/or default or foreclosure process" with regard to the Flintlock loan.

In its response on November 3, 2010, Sovereign, through its Senior Counsel, Bertin Emmons, provided a five-page loan payment history, which included an escrow history and an itemization of all fees and charges incurred.  Emmons indicated that he would provide copies of other requested "loan documents," which in his view were not properly within the scope of a qualified written request, for a fee of $5.00 per page.

Sovereign argues that the letter from counsel for the Sturgises was not a proper qualified written request because the majority of the documents it requested did not relate to the servicing of the loan.  12 U.S.C. § 2605(e)(1)(B) defines a "[q]ualified written request" as a "written correspondence . . . [that] includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B). 12 U.S.C. § 2605(e) requires the servicer of a federally related mortgage loan receiving a qualified written request "relating to the servicing" of the loan to "make appropriate corrections" to the account if necessary, and, "after conducting an investigation" provide a "written explanation or clarification" to the borrower containing the information requested or an explanation of why the information is unavailable.  If a servicer fails to comply with the requirements of § 2605(e), the servicer is liable to the borrower for any actual damages resulting from the failure to comply and for any additional damages, not exceeding $1,000.00, that the court may grant if there is a showing of a pattern or practice of noncompliance with the requirements of the section.  12 U.S.C. § 2605(f)(1).

The statute defines servicing as:

> receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3).

As I observed in my ruling on Sovereign's motion to dismiss this claim, and as the Sturgises now concede, a number of the requests that the Sturgises made are unrelated to servicing as defined by the statute. *Sturgis*, 863 F. Supp. 2d. at 104-05. Among these requests are the requests for copies of the Pooling and Servicing Agreement and disclosure statements provided to investors with respect to any mortgage security trust that might contain the Sturgises' promissory note(s).  However I also observed that a number of the requests "fit precisely within the ambit defined by the statute." *Id.* at 105.  Examples of such requests include a request for an itemized statement of the charges against the loan and an itemized statement of late charges made to the account, as well as a request for information regarding whether the account has been charged with Vendor's Single Interest insurance.

The case law is not particularly helpful in addressing a situation where a purported QWR contains requests for both

servicing and non-servicing related information.  I could find only one case articulating the responsibility of a lender to respond to a purported QWR that requests certain information related to servicing, but the general tenor of which is a broad request for essentially any and all documents that may or may not contain information that might assist the borrower in litigation related to an impending foreclosure.  *See McDonald* v. *OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1094-95 (W.D. Wash. 2013) (where borrower requested 186 different documents or categories of documents related to his loan, borrower only obligated to respond to requests related to servicing).  As the court in *McDonald* explained, the requirement that QWRs be limited to inquiries related to the servicing of a loan was intended to "forestall the feared flood" of documentation requests made by borrowers who had defaulted on their loans.  *Id.* at 1094-95.

The Sturgises rely primarily on a Seventh Circuit case, *Catalan* v. *GMAC Mortg. Corp.*, 629 F.3d 676, 686-87 (7th Cir. 2011), and other cases citing *Catalan*, for the proposition that "RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a qualified written request and respond accordingly . . . . Any reasonably stated written request for account information can be a qualified written request." *Id.* at 687.  The purported QWR letters at

issue in *Catalan,* however, all concerned payments that the borrowers had made to the lender but were allegedly not being properly credited against their account. *See id.* at 686-90. Nothing in *Catalan*, or the other cases cited by the Sturgises, implies that a QWR may properly include, or that a lender has a duty to respond to, inquiries not concerning the "servicing" of a loan. *See In re Julien*, 488 B.R. 502, 508 (Bankr. D. Mass. 2013) (letter was QWR where debtor "made a detailed request for information regarding, inter alia, her monthly interest rate, scheduled payments . . . how payments are applied to her account, account balances, and the incurrence of additional expenses, charges, and fees).

I denied Sovereign's motion to dismiss the Sturgises' RESPA claim because I could not properly evaluate the claim without an opportunity to review the documents that Sovereign provided in response to the qualified written request, and because the parties had not yet conducted the discovery necessary to prove whether Sovereign possessed and failed to produce relevant requested information. After reviewing the summary judgment record and revisiting the parties' arguments, I am able to make several observations.

I agree with and am mindful of the fact that "RESPA and the QWR regulation was not designed, and should not be used, as a

vehicle to permit in default borrowers to flood their lender with documentation requests, on the hope that a failure to timely comply will lead to an affirmative cause of action, or a defense to a collection or foreclosure action." *Eifling* v. *National City Mortg.*, 2011 WL 893233 at *3 (W.D. Wash. March 15, 2011).  Even drawing all reasonable inferences in favor of the Sturgises, as I am required to do, it is apparent that the bulk of their counsel's purported QWR letter was intended for the illegitimate purpose condemned in *Eifling*.  With that said, however, and assuming that the lender still has a duty to respond to such a letter to the extent it requested information related to servicing, genuine disputes of material fact *might have* precluded entry of summary judgment in Sovereign's favor on this claim, if it were not for one key problem:  The Sturgises suffered no "*actual damages as a result*" of any purported RESPA violation, as required by 12 U.S.C. § 1605(f)(1)(A) (emphasis added).[14]  *See, e.g.* *Jenkins* v. *BAC Home Loan Servicing, LP*, 822 F. Supp. 2d 1369, 1376-77 (M.D. Ga. 2011); *Lal* v. *American Home Servicing, Inc.*, 680 F. Supp. 2d 1218, 1223 (E.D. Cal. 2010);  *Allen* v. *United Fin. Mortg. Corp.*, 660 F. Supp. 2d. 1089, 1096 (N.D. Cal. 2009).  The Sturgises admit that they were not aware of any

---

[14] Nor do the Sturgises allege that the Bank engaged in a "pattern or practice of noncompliance" which, if proven, would entitle them to statutory damages.  *See* 12 U.S.C. § 1605(f)(1)(B).

errors in the Bank's accounting for the Flintlock loan, and in his deposition, Mr. Sturgis admitted that he did not even review the documents the Bank did provide in response to the QWR.   The Sturgises have offered nothing more than a general allegation that they suffered damages as a result of the Bank's failure to respond adequately to their QWR.   Accordingly, Sovereign is entitled to summary judgment on this claim.

**D. Unlawful Set-Off**

The Sturgises claim that Sovereign unlawfully withdrew funds from Mr. Sturgis's account without warning or authorization. Sovereign responds that the withdrawal was a lawful setoff permitted by both contract and common law.

In support of its argument, the Bank produced a signature card bearing Michael Sturgis' signature and the date "4-26-93," the date on which he opened the account.   Mr. Sturgis' name and address are also printed on the card, along with some other redacted identifying information.   The text on the card states: "[t]he undersigned hereby agree to the Rules and Regulations of the NANTUCKET BANK, Nantucket, Massachusetts *and any amendments hereafter made.*" (emphasis in original).   The Deposit Account Agreement in effect at the time of the set-off provides that: "[w]e may set-off funds in your account and any other accounts

held by you, jointly or individually, to pay any debt you owe to us."

Mr. Sturgis admitted in his deposition that the signature card bears his signature.  The Sturgises argue that the Bank "has shown no correlation or legal connection between the 'Signature Card' and 'Deposit Account Agreement'" but offer no evidence or legal authority to support this argument.[15]  Accordingly, Sovereign is entitled to summary judgment on this claim on the ground that the set-off was authorized by contract.[16]

_____

[15] The Sturgises rely on two unpublished decisions of New York trial courts for the statement: "[t]here is no affidavit or documentary evidence that the Credit Card Agreement was the actual agreement between petitioner and respondent."  These citations are inapposite.  Here, there is both affidavit and documentary evidence that the Deposit Account Agreement was the actual agreement between Mr. Sturgis and the Bank, and he signed a document acknowledging the Bank's unilateral right to amend the terms of their agreement from time to time.

[16] Because I conclude that the set-off was authorized by contract, I need not reach Sovereign's common law argument.  However, I am, after exploration of the issue, *see Sturgis*, 863 F. Supp. 2d at 87, satisfied that as a matter of federal common law, Sovereign enjoyed the right of set-off.  *See U.S.* v. *Butterworth-Judson Corp.*, 267 U.S. 387, 394-95 (1925) (citing *Studley* v. *Boylston Bank*, 229 U.S. 523, 528 (1913); *New York Cnty. Bank* v. *Massey*, 192 U.S. 138, 145 (1904) ("Ordinarily, the relation existing between banks and their depositors is that of debtor and creditor, out of which the right of set-off arises.  As a general rule, in the absence of an agreement to the contrary, a deposit, not made specifically applicable to some other purpose, may be applied by the bank in payment of the indebtedness of the depositor.").  This mirrors long standing state common law treatment of the issue.  *Cf. Laighton* v. *Brookline Trust Co.*, 114 N.E. 671, 672 (Mass. 1917); *National Mahaiwe Bank* v. *Peck*, 127 Mass. 298, 300 (1878).  The fact that the Massachusetts Legislature has made this right a matter of statute as well for

-41-

**E. Remaining Claims**

The majority of the Sturgises counterclaims depend on the underlying premise that the foreclosures were invalid.  These counterclaims include: a declaratory judgment of non-liability on the notes (Count One); breach of contract (Count Two); slander of title (Count Three); intentional or reckless infliction of emotional distress (Count Six)[17]; and tortious interference with contractual relations (Count Nine).  Since I have concluded that the foreclosures were valid, Sovereign is entitled to summary judgment on those counts.

---

banks incorporated in Massachusetts, *see Sturgis*, 863 F. Supp. 2d. at 87, does not imply that Massachusetts has restricted the common law right of federally chartered banks to set off, even if Massachusetts had the power to do so.

[17] Nor have the Sturgises pointed to any evidence that would support holding the Bank liable for intentional infliction of emotional distress.  To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." *Sena* v. *Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994).  Liability for "extreme and outrageous" conduct may be found only where the "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Foley* v. *Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quoting Restatement (Second) of Torts § 46 comment *d* (1965)).  The record here shows no such conduct.

Of the remaining counts, I have already addressed and granted summary judgment to Sovereign with respect to the RESPA claim (Count Four) and the claim for unlawful set-off (Count Five).  That leaves the claims for violations of Mass. Gen. Laws ch. 93A (Count Seven) and for breach of the implied covenant of good faith and fair dealing in the mortgage contract (Count Eight), as the only remaining counts that do not depend entirely on the invalidity of the underlying foreclosures.

1.  <u>Mass. Gen. Laws ch. 93A claim (Count Seven)</u>

Sovereign's only argument in support of summary judgment with respect to the Mass. Gen. Laws ch. 93A claim is that it "must fail to the extent predicated on any deficiency in the foreclosures, as there were none."  While much of the Sturgises' ch. 93A claim is indeed predicated on the alleged deficiencies in the foreclosures, they also allege unfair and deceptive acts and practices in the Bank's negotiations with the Sturgises to avoid the foreclosures.  Furthermore, Sovereign's assertion that "there can be no [ch.] 93A violation because [the mortgagee] had the legal right to foreclose" is incorrect.  "Legality of underlying conduct is not necessarily a defense to a claim under [ch.] 93A." *Kattar* v. *Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000) ("clearly unfair, within the meaning of [ch.] 93A, to use [right to

foreclose]" for a reason so obviously against public policy [compelling witness testimony]").

Unfortunately for the Sturgises, however, nothing in the record demonstrates anything other than an incomplete negotiation to reach a new contract with the Bank and avoid foreclosure. Even assuming the dubious proposition that Mr. Bokelkamp's broad statements to Mr. Sturgis to the effect that the Bank would "work" with him could be considered unfair or deceptive, "[t]o warrant an award of damages under [ch.] 93A, there must be a 'casual connection between the seller's deception and the buyer's loss.'" *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 532 (Mass. 2006) (quoting *Kohl* v. *Silver Lake Motors, Inc.*, 343 N.E.2d 375, 379 (Mass. 1976)). Causation is established if the deception "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." *Hershenow*, 840 N.E.2d at 535

As has been observed, "[h]ighly generalized expressions of good will such as, '[w]e'll work with you,' and '[w]e don't want to own your house,' do not cause a borrower of ordinary perspicacity, who signs highly specific loan documents, reasonably to believe that the documents are without meaning." *Hogan* v. *Riemer*, 619 N.E.2d 984, 989 (Mass. App. 1993) (affirming grant of summary judgment to defendant lender on ch. 93A claims

-44-

arising, in part, from pre-contractual statements made by lender to borrower that it would "work with [her]" and "would not take [her] house" in the event she had "payment problems").  To the extent Mr. Sturgis interpreted vague representations by Mr. Bokelkamp that the Bank would "work out something satisfactory to move forward," to mean that the Bank would simply delay foreclosure indefinitely as the Sturgises continued to be in default and the arrearage continued to grow, such an interpretation was plainly unreasonable.  Nor was it reasonable for Mr. Sturgis to rely on these statements to forgo any effort on his part to find a buyer for the restaurant, refinance with another lender, or take whatever other steps he could to attempt to cure the default.  As a result, the Sturgises' ch. 93A claims fail as a matter of law.

2. <u>Breach of Implied Covenant of Good Faith and Fair Dealing (Count Eight)</u>

As with the ch. 93A claim, the majority of the allegations made under this count depend on the invalidity of the underlying foreclosures.  The claim that the Bank failed to act in good faith in its negotiations with the Sturgises to avoid the foreclosures does not.  However, as with the ch. 93A claim, nothing in the record demonstrates – nor do the Sturgises articulate any legal argument – that the Bank breached the

covenant of good faith and fair dealing implicit in the mortgage contract by failing to work-out the defaulted Scootsam loan.

### IV.   CONCLUSION

For the reasons stated more fully above, I GRANT summary judgment in Sovereign's favor with respect to both the complaint and all of the Sturgises' counterclaims.

_**/s/ Douglas P. Woodlock**_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE